Edward J. ALLISON and Henry
Charles Safford, Appellants–
Plaintiffs,

v.

UNION HOSPITAL, INC., and Wabash
Valley Anesthesia, P.C., Appellees–
Defendants.

No. 77A01–0709–CV–435.

Court of Appeals of Indiana.

March 20, 2008.

Robert P. Kondras, Jr., Hunt, Hassler & Lorenz, LLP, Terre Haute, IN, Attorney for Appellants.

N. Kent Smith, Hall, Render, Killian, Heath & Lyman, P.C., Indianapolis, IN, Attorney for Appellee Union Hospital.

Jeffry A. Lind, John Wilkinson, Fleschner, Stark, Tanoos & Newlin, Terre Haute, IN, Attorneys for Wabash Valley Anesthesia.

## OPINION

BAKER, Chief Judge.

Appellants-plaintiffs Edward J. Allison and Henry Charles Safford (collectively, the appellants) appeal the trial court's order entering partial summary judgment in favor of appellees-defendants Union Hospital, Inc. (Union), and Wabash Valley Anesthesia, P.C. (WVA) (collectively, the appellees). The appellants argue that the trial court erroneously entered summary judgment in the appellees' favor on the appellants' claims for tortious interference with contractual relationship against both appellees and constructive fraud and breach of the duty of good faith and fair dealing against Union. Finding that summary judgment was erroneously entered on the tortious interference claim against Union but properly entered on all remaining counts, we affirm in part, reverse in part,

and remand for trial on the tortious interference claim against Union.

## FACTS[1]

Allison and Safford are Certified Registered Nurse Anesthetists (CRNA) who have worked for Union as independent contractors since July 1991. The parties renegotiated and executed a new contract on October 22, 2001, and that agreement included a provision specifying that either party could terminate the contract without cause. The appellants eventually concluded that the terms of the October 2001 contract were causing them financial difficulty. Thus, on May 31, 2005, they sent a letter to Steve Reed, Union's former Executive Vice President and COO, providing ninety days of notice of their decision to terminate the contract pursuant to a without cause termination provision in the document. In the letter, the appellants expressed their desire to negotiate a new contract and referenced a previously scheduled meeting with Reed that was to take place on June 28, 2005. In the meantime, Union tried to find other CRNAs to replace the appellants but received no bids from other service providers.

On June 28, 2005, the appellants met with Reed as planned. Reed told the appellants that he wanted a three-year agreement and that he wanted the appellants "locked in to the three-year term." Appellants' App. p. 417. Union proposed a new contract in a June 30, 2005, letter, which the appellants rejected. The appellants submitted a counteroffer on July 9, 2005. On July 22, 2005, Union accepted the appellants' July 9 counteroffer:

> This letter is to accept your proposal dated July 9, 2005 regarding [Union] paying [the appellants], collectively, a

---

1. We direct the attention of counsel for the appellants and WVA to Indiana Appellate Rule 46(A)(6)(c), which requires that the statement of facts "shall be in narrative form...."

monthly stipend amount of $29,166.00 to continue providing 24/7 OB Anesthesia coverage here at [Union].

This agreement will be effective August 1, 2005, and continue in force until August 31, 2008.

All other terms and conditions of the Obstetrics Area Anesthesia Agreement dated October 22, 2001, as well as the three separate addendums [sic] to this agreement, will continue in force and effect.

Please sign a copy of this letter below.... I will then ask [Union's attorney] to prepare a fourth addendum to the Obstetrics Area Anesthesia Services Agreement which contains the new monthly stipend amount for your review and signature in the very near future.

*Id.* at 141. Reed and the appellants signed the July 22, 2005, letter.

Union's attorney proceeded to draft a formal agreement for the appellants' signature, but instead of being an addendum it was a wholly new, thirteen-page "Amended Obstetrics Area Anesthesia Services Agreement" (the Contract), which he sent to the appellants on August 16, 2005. *Id.* at 143. The Contract has an effective date of August 1, 2005, and was to expire on July 31, 2008. It also has a lengthy termination provision, which states that the Contract may be terminated in a number of different ways, all of which are for cause, because of governmental action, or based on the parties' mutual written agreement. *Id.* at 151–52. The Contract does not permit termination without cause. Additionally, the document contains a provision requiring the parties to hold its terms "strictly confidential," prohibiting disclosure of its terms to third parties "except as specifically required by law or upon agreement of the parties." *Id.* at 154. It provides that as of its effective date, the Contract shall supersede all pre-vious agreements between the parties and that it "may be amended only by an instrument in writing signed by the parties...." *Id.* Safford signed the Contract on August 18, 2005, and Allison signed on August 20, 2005.

On September 12, 2005, Reed sent the appellants a letter terminating the Contract:

This letter puts in writing [Union's] notice that we will be terminating the current OB Anesthesia Services Agreement effective December 31, 2005.... This termination is pursuant to Section 8 of the current [Contract] requiring us to provide you with Ninety (90) days written notice for terminating said agreement without cause.

*Id.* at 93. After receiving this letter, the appellants demanded to see copies of the Contract. Reed's secretary then e-mailed the appellants an *altered* copy of the Contract. The altered version included a new "Without Cause Termination" paragraph providing that the Contract may be terminated "[w]ith or without cause upon one party giving the other party at least ninety (90) days written notice prior to the date of intended cancellation or termination." *Id.* at 172. It is undisputed that the version of the Contract that Union e-mailed to the appellants on September 26, 2005, was different from the version the appellants actually signed and executed.

Union insists that it was compelled to enter into the Contract and agree to the financial terms requested by the appellants because it was unable to find another provider and did not want to have an interruption in its OB anesthesia service. But because the appellants had demanded a 325% increase in their monthly stipend, Union was examining other options even as it executed the Contract with the appellants. To that end, in mid-August 2005— even as the appellants were reviewing and

executing the Contract—Reed entered into discussions with Elliott McGregory, a principal of WVA, which was an entity capable of providing OB anesthesia services.

On August 22, 2005, Reed and McGregory met to discuss a possible agreement between Union and WVA for OB anesthesia services. At the meeting, Reed informed McGregory that "at the present time," Union "worked under an agreement" with the appellants. *Id.* at 216. Reed also told McGregory that Union's contract with the appellants allowed the hospital "to terminate the agreement without cause by giving a ninety day notice." *Id.* The parties agreed on key terms to serve as a basis for a proposed contract. As contract negotiations continued, Reed emphasized to WVA "that we will need to give the existing OB Anesthesia group a 90–day termination notice per the existing contract" before entering into a final agreement with WVA. *Id.* at 222. Thus, on September 13, 2005—one day after Union sent the termination letter to the appellants—Union and WVA reached a verbal agreement, which was eventually memorialized in writing on November 8, 2005. Prior to terminating the Contract, Reed had not informed the appellants that he was negotiating with WVA.

On November 23, 2005, the appellants filed a complaint against the appellees, alleging breach of contract against Union, tortious interference with a contractual relationship against Union and WVA, tortious interference with prospective economic advantage[2] against Union and WVA, constructive fraud against Union, and breach of the duty of good faith and fair dealing against Union. On December 29, 2006, the appellants filed a motion for partial summary judgment on their claim for breach of contract against Union and for tortious interference with a contractual relationship against both appellees. Union and WVA filed separate motions for summary judgment against the appellants on December 29, 2006, seeking judgment on all of the appellants' claims.

Following a hearing, the trial court entered an order on July 17, 2007, denying the appellants' motion for partial summary judgment and partially granting the appellees' respective motions for partial summary judgment. The trial court found that there were ambiguities relating to the terms of the Contract; consequently, it refused to grant summary judgment in any party's favor on that claim. The trial court granted summary judgment in the appellees' favor on the remaining tort claims without explaining its reasons for doing so. The trial court made its summary judgment ruling a final order on September 11, 2007, and has scheduled the appellants' breach of contract claim against Union for trial beginning December 2, 2008. The appellants now appeal.

## DISCUSSION AND DECISION

### I. Standard of Review

Summary judgment is appropriate only if the pleadings and evidence considered by the trial court show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Owens Corning Fiberglass Corp. v. Cobb*, 754 N.E.2d 905, 909 (Ind.2001); *see also* Ind. Trial Rule 56(C). On a motion for summary judgment, all doubts as to the existence of material issues of fact must be resolved against the moving party. *Owens Corning*, 754 N.E.2d at 909. Additionally, all facts and reasonable inferences from those facts are construed in favor of the nonmov-

2. Apparently, the appellants' attorney voluntarily withdrew this claim during the summary judgment hearing. Appellants' App. p. 10.

ing party. *Id.* If there is any doubt as to what conclusion a jury could reach, then summary judgment is improper. *Id.*

An appellate court faces the same issues that were before the trial court and follows the same process. *Id.* at 908. The party appealing from a summary judgment decision has the burden of persuading the court that the grant or denial of summary judgment was erroneous. *Id.* When a trial court grants summary judgment, we carefully scrutinize that determination to ensure that a party was not improperly prevented from having his or her day in court. *Id.*

### II. Tortious Interference with Contractual Relationship

▄▄▄ Our Supreme Court has commented that

Indiana has long recognized that intentional interference with a contract is an actionable tort, and includes any intentional, unjustified interference by third parties with [a] ... contract. The tort reflects the public policy that contract rights are property, and under proper circumstances, are entitled to enforcement and protection from those who tortiously interfere with those rights.

*Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1234 (Ind.1994) (citation omitted). A plaintiff alleging tortious interference with a contractual relationship must establish five elements: (1) the existence of a valid and enforceable contract; (2) the defendant's knowledge of the existence of the contract; (3) the defendant's intentional inducement of the breach of the contract; (4) the absence of justification; and (5) damages resulting from the defendant's wrongful inducement of the breach. *Id.* at 1235.

The parties herein focus their dispute on whether the actions of Union and WVA were justified. In determining whether a defendant's conduct in intentionally inter-

fering with a contract is justified, our Supreme Court has suggested that we look to the factors set forth by the Restatement (Second) of Torts:

(a) the nature of the defendant's conduct;

(b) the defendant's motive;

(c) the interests of the plaintiff with which the defendant's conduct interferes;

(d) the interests sought to be advanced by the defendant;

(e) the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff;

(f) the proximity or remoteness of the defendant's conduct to the interference; and

(g) the relations between the parties.

*Id.* (citing Restatement (Second) of Torts § 767 (1977)). "[T]he weight to be given to each consideration may differ from case to case depending upon the factual circumstances, but *the overriding question is whether the defendants' conduct has been fair and reasonable under the circumstances.*" *Id.* (emphasis added).

### A. Union

▄▄▄ Initially, we point out that "[a]lthough it is true that a party to a contract is not subject to liability for tortious interference with its own contract if it acts alone, it may be subject to liability for conspiring with another party to tortiously interfere with the contract." *Id.* at 1234 n. 7 (citation omitted). Union does not deny that it conspired with WVA to break the Contract. Thus, Union faces potential liability for this tort because it allegedly conspired with WVA to interfere with the

Contract.[3]

■ To demonstrate that it is entitled to summary judgment, the movant may meet its burden by demonstrating that the undisputed material facts negate at least one element of the plaintiff's claim. *Id.* at 1235. Here, Union argues that the undisputed material facts establish that its actions were justified. We will apply the factors set forth by the Restatement to analyze this issue.

■ *Nature of the defendant's conduct.* Union admits that even as it entered into the Contract with the appellants it was engaging in negotiations with WVA and that it had no intention of honoring the Contract. Appellants' App. p. 427–29, 431, 461. Union approached WVA in secret, hoping that WVA would agree to enter into an agreement with Union to provide OB anesthesia services for the hospital, thereby enabling Union to terminate the Contract. *Id.* Union also admits that it had no cause to terminate the Contract. *Id.* at 93.

Union argues that it had the right—or believed it had the right—to terminate the Contract without cause so long as it afforded the appellants with ninety days notice of the termination. The appellants, in contrast, argue that the Contract was not terminable at will. Although the appellants' breach of contract claim is *not* before us on appeal, we must consider its merit in analyzing Union's behavior.[4]

There is no dispute that the Contract did not contain a provision permitting termination without cause. Union essentially argues that it was a mistake—a scrivener's error—that the document omitted such a clause. Even if that had been the case, however, the proper remedy would have been either to amend the document and have the appellants sign the amendment or, had they refused, to ask a trial court to reform the Contract. *See Harlan Bakeries, Inc. v. Muncy,* 835 N.E.2d 1018, 1029–30 (Ind.Ct.App.2005) (holding that a trial court is permitted to reform contracts if there was a scrivener's error and both parties were mistaken as to the actual contents of the document). Instead, Reed realized that the Contract did not contain a without cause provision,[5] failed to discuss its omission with the appellants, terminated the Contract pursuant to the nonexistent provision, and then inserted the provision into an altered version of the Contract that it sent to the appellants following

3. We have not been asked to decide whether a party may recover damages for both breach of contract *and* tortious interference with that same contract. We express no opinion on the issue, though we note that in most, if not all, cases, the damages stemming from the two claims would likely be identical.

4. We note that the record on appeal pertains solely to the appellants' claims for tortious interference, constructive fraud, and breach of the duty of good faith and fair dealing. Thus, there may be other evidence to which we are not privy that would affect a factfinder's determination on the appellants' breach of contract claim. We do not intend to suggest that the trial on that claim should be affected by our analysis herein.

5. To the extent that Union hinges its argument on the fact that Reed refused to sign the Contract after he realized that it did not contain a termination without cause provision, we point out that the appellant had already signed and executed the document at that point. When Union drafted a full, thirteen-page Contract and transmitted it to the appellants, it deviated from the parties' agreement memorialized in the July 22, 2005, letter that the parties' old contract would be used and amended via an addendum. In drafting and transmitting a wholly and substantively new contract, Union essentially made a new offer to the appellants consisting of the new Contract. When they signed the document, they accepted the offer and the document was valid and binding. Reed's signature was not required.

termination—though it did not inform the appellants of the alteration. Based on the record available to us, therefore, we find that *at the least*, there is a question of material fact as to whether Union's actions with respect to the contents of the Contract were justified.

The appellants further contend that Union's bad faith is demonstrated by the fact that it informed WVA of the alleged Contract provision permitting it to terminate the Contract without cause provided that it afforded the appellants with ninety days notice. In so doing, the appellants insist that Union breached the Contract's confidentiality provision. Although it is unclear whether informing a nonparty of a Contract clause that does not actually exist would constitute a breach of the confidentiality clause, we need not answer that question. The confidentiality clause is clearly intended to prevent the disclosure of the proprietary and competitive terms of the agreement relating to compensation and the scope of services provided. Reed neither showed WVA's representative the Contract nor discussed the financial terms or other competitive provisions contained in the document. Reed was merely confirming his ability to negotiate with WVA for Union's OB anesthesia work. We do not find this action to rise to the level of a breach of the Contract's confidentiality provision.

■ Union argues that the appellants have not established that it acted maliciously or with ill will. The appellants, however, direct our attention to a passage from *Wade v. Culp*, in which a panel of this court described the intent required to tortiously interfere with a contractual relationship:

"The great weight of authority in this country and in England is to the effect that, if A. has a legal contract with B., either for the rendition of service or any other purpose, and C., having knowledge of the existence thereof, intentionally and knowingly, and without reasonable justification or excuse, induces B. to break the contract, by reason of which A. sustains damage, an action will lie by A. against C. to recover the same.... The action of C. is malicious, in that, with the knowledge of A.'s rights, he intentionally and knowingly and for unworthy or selfish purposes, destroys them by inducing B. to break his contract. *It is a wrongful act, done intentionally, without just cause or excuse, and from this a malicious motive is to be inferred. This does not necessarily mean actual malice or ill will, but the intentional doing of a wrongful act without legal or social justification.* The action is predicated, not on the intent to injure, but on the intentional interference, without justification, with A.'s contractual rights, with knowledge thereof. It is a legal wrong, and one who commits it, if damage be sustained, must answer therefor."

107 Ind.App. 503, 23 N.E.2d 615, 618 (1939) (quoting *Campbell v. Gates*, 236 N.Y. 457, 141 N.E. 914, 915 (1923)) (emphasis added). Thus, the appellants need not prove that Union acted with ill will. Instead, they must establish that (1) Union knew of the existence of a valid and binding Contract—clearly, it did, inasmuch as it was a party thereto; and (2) Union acted without reasonable justification or excuse, which is what we must determine herein. Whether Union harbored actual ill will towards the appellants is irrelevant for the purpose of determining whether it committed this tort.

*The defendant's motive and interests sought to be advanced.* Union argues that its actions were justified based on its legitimate business interests. Although it does not contend that it was unable to pay the

appellants pursuant to the Contract or that it was approaching financial insolvency, it insists that its conduct was fair and reasonable given that the appellants had demanded—and received—a 325% raise under the Contract. The appellants point out, however, that if Union was concerned about the size of raise they demanded, the hospital would have been "well within its rights to find another service provider rather than negotiate a new contract" with the appellants. Appellants' Br. p. 31. And indeed, Union did attempt to find other anesthetists to provide the necessary coverage but was unable to secure any bids for wages less than those demanded by the appellants. Having willingly entered into the Contract with its eyes open as to the terms demanded by the appellants, Union may not now base its defense on an argument that those terms were unfair. *See Bogigian v. Bogigian*, 551 N.E.2d 1149, 1153 (Ind.Ct.App.1990) (holding that " '[t]he freedom to contract includes the freedom to contract improvidently' ") (quoting *Rutter v. Excel Indus., Inc.*, 438 N.E.2d 1030, 1031 (Ind.Ct.App. 1982)).

*The interests of the plaintiffs.* The appellants are seeking to protect their contractual rights, their financial interests, and their livelihood. *See Winkler*, 638 N.E.2d at 1234 (describing "the public policy that contract rights are property").

*The balance between the defendant's freedom to act and the plaintiff's contractual interests.* This balance must always be considered when this tort is at issue. There is nothing out of the ordinary in these factual circumstances suggesting that the analysis of this factor should proceed differently than it would in any other case.

*The proximity of the defendant's conduct to the interference.* Union's conduct—entering into a contract by which it did not intend to abide and secretly working with another entity to secure services before terminating the Contract—*was* the interference. Union, however, emphasizes that "the law of contracts governs this dispute and will supply the full measure of relief to the [appellants] if they are successful on their breach of contract claim." Union Br. p. 24.

*The relations between the parties.* The parties have had a contractual relationship for years. Union and the appellants are on equal footing in terms of sophistication and ability to protect their own self-interests.

In weighing all of these factors, we find this to be a very close call. And as noted above, the ultimate question relating to the justification of the defendant's conduct is whether that conduct has been fair and reasonable under the circumstances. We find this inquiry to be so highly fact sensitive that we conclude it is best answered by a factfinder. Although it is possible that under certain circumstances this question may be answered as a matter of law—and, indeed, we make just such a finding with respect to WVA below—we do not find that to be the case with respect to Union, based primarily on its conduct with respect to the without cause termination provision. Consequently, we cannot conclude that Union is entitled to judgment as a matter of law on the appellants' claim for tortious interference and we remand for trial on this claim.

## B. WVA

■ The appellants next argue that the trial court erroneously granted summary judgment in WVA's favor on the tortious interference claim. Although WVA offers multiple reasons why it should not be held liable for tortious interference as a matter of law, we find one dispositive—that its actions were justified. As above, we will

examine the factors set forth by the Restatement.

*Nature of the defendant's conduct.* It is undisputed that Union approached WVA and that WVA's conduct was limited to agreeing to be a replacement provider of OB anesthesia services. As for WVA's knowledge of the Contract, Union told WVA that the Contract was terminable at will so long as the appellants were given ninety days notice of the termination. Thus, WVA entered into negotiations with Union pursuant to an understanding that the hospital could permissibly end its contractual relationship with the appellants with a simple ninety days notice.

*The defendant's motive and interests sought to be advanced.* WVA's motive was its own legitimate business interest.

*The interests of the plaintiffs.* As above, the appellants are seeking to protect their contractual rights, their financial interests, and their livelihood. *See Winkler,* 638 N.E.2d at 1234 (describing "the public policy that contract rights are property").

*The balance between the defendant's freedom to act and the plaintiff's contractual interests.* As noted above, this balance must always be considered when this tort is at issue. There is nothing out of the ordinary in these factual circumstances suggesting that the analysis of this factor should proceed differently than it would in any other case.

*The proximity of the defendant's conduct to the interference.* WVA's agreement to provide Union with OB anesthesia services was a proximate cause of Union's termination of the Contract, inasmuch as Union would not have terminated the Contract unless it had another provider ready to step in. WVA insists that it was the appellants' demand for a 325% raise that caused the termination of the Contract,

but that conduct was wholly separate from the termination of the Contract. If Union had been displeased with the demand for a raise, it was free to decline to enter into the Contract. Inasmuch as Union *did* execute the Contract, however, neither Union nor WVA may successfully argue that the appellants' demand caused the situation in which they find themselves.

*The relations between the parties.* WVA and the appellants do not have a contractual relationship. They were competitors in the marketplace for anesthesia providers. They are on equal footing in terms of sophistication and ability to protect their own self-interests.

Although WVA knew of the existence of the Contract between Union and the appellants, it believed the agreement to have been terminable at will. The appellants were not required to establish that WVA acted with actual ill will toward the appellants, but it was incumbent on them to show, at the least, that WVA conspired with Union to *breach* the contract. WVA believed that so long as Union afforded the appellants ninety days notice of termination, it would be abiding by the terms of, rather than breaching, the Contract. Under these circumstances, we find as a matter of law that WVA's actions were justified. Consequently, the trial court properly entered summary judgment in WVA's favor on the tortious interference claim.

### III. Constructive Fraud

 The appellants next argue that the trial court erroneously granted summary judgment in Union's favor on their constructive fraud claim. Constructive fraud "arises by operation of law from a course of conduct which, if sanctioned by law, would secure an unconscionable advantage, irrespective of the existence or evidence of actual intent to defraud." *Stoll v. Grimm,* 681 N.E.2d 749, 757 (Ind.

Ct.App.1997). The elements of constructive fraud are:

1. A duty existing by virtue of the relationship between the parties;

2. A violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when the duty to speak exists;

3. Reliance thereon by the complaining party;

4. Injury to the complaining party as a proximate result of the reliance; and

5. The gaining of an advantage by the party to be charged at the expense of the complaining party.

*Marathon Oil Co. v. Collins,* 744 N.E.2d 474, 480 (Ind.Ct.App.2001). This court has held that parties may not rely on a contractual relationship to create a duty that, if breached, would form the basis of a constructive fraud claim. *Morgan Asset Holding Corp. v. CoBank, ACB,* 736 N.E.2d 1268, 1273 (Ind.Ct.App.2000). Inasmuch as the only possible basis for Union's duty to the appellants is the Contract,[6] we can only conclude that the appellants have failed, as a matter of law, to establish that they are entitled to relief on their constructive fraud claim. Consequently, we find that the trial court properly entered summary judgment in Union's favor on this claim.

### IV. Good Faith and Fair Dealing

 Finally, the appellants contend that the trial court erroneously granted summary judgment in Union's favor on their claim for breach of the duty of good faith and fair dealing. Indiana courts have recognized an implied covenant of good faith and fair dealing in contract law, but generally only in limited circumstances involving employment contracts and insurance contracts. *Lake County Trust Co. v. Wine,* 704 N.E.2d 1035, 1039 (Ind.Ct.App. 1998). If the contract is ambiguous or expressly imposes such a duty on the parties, then the courts will impose such a duty. *First Fed. Sav. Bank of Ind. v. Key Markets, Inc.,* 559 N.E.2d 600, 604 (Ind. 1990). Our Supreme Court has explained the courts' reluctance to extend this duty to other, unambiguous contracts:

> It is not the province of courts to require a party acting pursuant to such a[n unambiguous] contract to be "reasonable," "fair," or show "good faith" cooperation. Such an assessment would go beyond the bounds of judicial duty and responsibility. It would be impossible for parties to rely on the written expressions of their duties and responsibilities. Further, it would place the court at the negotiation table with the parties.

*Id.*

Here, the appellants do not argue that the Contract was ambiguous. Instead, they argue that there is a genuine issue of material fact regarding their relationship to Union. Specifically, the appellants contend that it may not be decided as a matter of law that they were independent contractors for, rather than employees of, Union, and that if they were Union's employees then the Contract is an employment contract implicitly encompassing the duty of good faith and fair dealing. The appellants, however, raise this argument for the first time in their Reply Brief on appeal. Their summary judgment pleadings contained no such argument. Thus, they have waived it. Furthermore, Allison

---

6. The appellants argue that they had a "confidential relationship" with Union, but we cannot agree. Reply Br. p. 18. They had a contractual relationship with Union. That the contract contained a confidentiality provision does not render the entire relationship confidential. Consequently, this argument must fail.

explicitly attested that he and Safford were independent contractors for, not employees of, the hospital. Appellants' App. p. 401. And most compelling of all, the Contract explicitly states as follows:

It is expressly understood and agreed that the parties hereto shall at all times act as independent contractors with respect to each other and not as employees or agents of each other. Further, it is expressly understood and agreed by the parties that nothing contained in this Agreement shall be construed to create a joint venture, partnership, association, or other affiliation or like relationship between the parties, it being specifically agreed that the relationship is and shall remain that of independent parties to a contractual relationship as set forth in the Agreement. . . .

Appellants' App. p. 148. Under these circumstances, we cannot conclude that Union assumed a duty of good faith and fair dealing pursuant to the Contract. Thus, the trial court properly granted summary judgment in Union's favor on this claim.

The judgment of the trial court is affirmed in part, reversed in part, and remanded for trial on the tortious interference claim against Union.

DARDEN, J., and BRADFORD, J., concur.