**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jan 11 2012, 8:39 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FORS APPELLANTS:

**MATTHEW D. BARRETT**
Matthew D. Barrett, P.C.
Logansport, Indiana

ATTORNEY FOR APPELLEES CITY OF LOGANSPORT and MICHAEL NICOLL:

**ANDREA R. SIMMONS**
Pollack Law Firm, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE JAMES McDONALD:

**KATHERINE J. NOEL**
Noel Law
Kokomo, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| VINCENT BARRETT and SARAH BARRETT, | ) | |
| | ) | |
| Appellants-Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No.  09A02-1103-PL-252 |
| | ) | |
| CITY OF LOGANSPORT, INDIANA; | ) | |
| MICHAEL NICOLL, in his capacity as | ) | |
| Sexton of Mount Hope Cemetery; and | ) | |
| JAMES McDONALD, | ) | |
| | ) | |
| Appellees-Defendants. | ) | |

APPEAL FROM THE CASS SUPERIOR COURT
The Honorable Richard A. Maughmer, Judge
Cause No. 09D02-0904-PL-7

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellants-plaintiffs Vincent and Sarah Barrett (collectively, "the Barretts") appeal the trial court's judgment in favor of appellees-defendants City of Logansport (Logansport), Michael Nicoll, in his capacity as Sexton of Mount Hope Cemetery (Cemetery), and James McDonald (collectively, the Defendants), on their claims for negligence, breach of contract, fraud, and injunctive relief. Specifically, the Barretts contend that the trial court erred in denying their motion for summary judgment and in dismissing their fraud count.

The Barretts also claim that the trial court erred in excluding the testimony of one of their witnesses, denying their request that this witness be permitted to visit a gravesite only days before trial, and refusing to give two of their proffered instructions. Finally, the Barretts contend that the trial court should have granted an injunction in their favor because an independent basis existed for the grant of such relief.

We conclude that the trial court erred in disallowing one their witnesses to testify and in denying their request to allow him to visit the gravesite just prior to trial. However, we find that the Barretts were not prejudiced to the extent that reversal is warranted. And finding no other error, we affirm the judgment of the trial court.

2

## FACTS

The Barretts' son, Daniel, was an Indiana State Trooper who was killed on January 27, 2008, at the age twenty-five, while pursuing a speeding vehicle in Fulton County. The Barretts purchased six grave easements from the city-owned Cemetery two days after Daniel's death. Prior to the purchase, the Barretts spoke with Nicoll, who was in charge of the Cemetery's operations.[1] After Nicoll gave the Barretts a tour of the area near the gravesite, they decided to use one of the easements for Daniel's grave.

The gravesite that the Barretts chose was graded evenly with a two-degree slope. Nicoll told the Barretts that there were no water drainage issues and that the area was appropriate for Daniel's burial. A Logansport ordinance indicated that the gravesite would receive "perpetual care." It was the Barretts' understanding that "perpetual care" described in the ordinance included keeping rainwater drained off of the graves. However, Nicoll testified during a deposition that the term "perpetual care" as used in the cemetery ordinance did not include keeping a gravesite well-drained. Appellants' App. p. 211.

On February 1, 2008, Daniel was laid to rest in one of the burial easements. Daniel's grave is situated close to another set of grave plots owned by Betty McDonald. McDonald had purchased fourteen plots in June 2007. On October 10, 2007, two headstone footers and a monument footer were placed on the McDonald family plots.

---

[1] Nicoll reports directly to Logansport's mayor.

Only one of the plots is currently occupied. Concrete foundations under the McDonald grave monuments were placed sometime during the summer of 2008. Three empty grave plots exist between the McDonald gravesite and Daniel's grave.

In June 2008, James McDonald, one of Betty's sons, visited the McDonald family plots. At that time, James observed that the north end of the family plot footer was protruding nearly fourteen inches from the ground. James also noted that the soil on the family plots was rocky with clumpy soil that contained ruts and various imperfections.

Thereafter, James introduced himself to Nicoll and explained that he was a landscape architect. James expressed his concern about the low soil around the family monument and requested some additional topsoil from Nicoll. Nicoll agreed to deliver the dirt as long as McDonald agreed to grade the new soil.

In August or September 2008, Nicoll approved the placement of the dirt and authorized a Cemetery employee to place it on the gravesite. The project took "between two and three truck loads" of dirt. Appellants' App. p. 215. A Cemetery employee brought in the dirt and James also placed some dirt on the site.

James graded the fill dirt, the result of which added two or three inches of dirt between the footers in the thickest parts. Nicoll requested that McDonald taper the ground down at the north end, and confirmed afterward that he had done so. The dirt approximates a circle with a diameter of about twenty-four feet and is about two feet thick near the center that diminishes the thickness as the dirt slopes downward toward

4

Daniel's grave. The dirt extended off the McDonald gravesite and on to the three graves next to Daniel's.

The Barretts later found out about the McDonalds' request for the placement of the dirt on the gravesite. At some point, Sarah observed a significant amount of surface water drainage, erosion, and ponding on Daniel's grave during and after rainfalls. Sarah regularly observed rainwater being discharged on Daniel's grave in new, defined channels that came directly from the McDonald gravesite. Sarah saw water in "a gully streaming" and "trenching" in an outline around the rim of the dirt mound funneling directly on to Daniel's grave. It was also observed that when excessive water collects on Daniel's grave, the grass turns "a brownish color." Appellants' App. p. 180-81. Moreover, the water soaks Daniel's grave and it becomes "mushy and gooshy." Id. at 181.

Likewise, Vincent has observed that "[a]n awful lot of water is . . . being funneled down" on Daniel's grave after the fill dirt had been placed on the McDonald gravesite. Id. at 163. The Barretts contended that the placement of the fill dirt on and around the McDonald family plot caused "a significant amount of surface water drainage, flow, and ponding problems as well as other forms of grave desecration" to Daniel's gravesite. Id. at 65.

Sometime during the fall of 2008, Vincent telephoned McDonald and advised her that the additional fill dirt had caused "rain to flow" on to Daniel's grave. Appellants' App. p. 169. Although Vincent asked McDonald to remove the dirt, she refused to do so.

Vincent then contacted Mayor Fincher and requested the City to remove the dirt. However, Mayor Fincher told him that there is "nothing [he] can do." Id. at 170.

In response, Nicoll went to the Barrett family plot on numerous occasions to specifically look for water problems, before and after the soil was spread, during rain and after rain. On nine separate days, Nicoll took pictures to depict the scene as it looked after it had rained. Nicoll observed that after a heavy rain, the grass was wet, but he did not observe any standing water during or shortly after a rain. Nicoll also did not observe any damage to the Barretts' gravesite, footer, or headstone. Nicoll determined that "[i]t's possible" that water ponding or excessive drainage problems could exist on Daniel's grave during rain, but he has just never observed it. Appellants' App. p. 212. Nicoll also stated that there was no existing maintenance problem on the McDonald gravesite before the dirt had been added.

James also visited the family plot after both severe and light rains. Neither he nor his wife ever observed any water on Daniel's gravesite after these rains. After inspecting the sites, James determined that any water drainage issues over Daniel's grave is because they never went "out and trimmed or cleaned up" the site. Appellants' App. p. 533. The Barretts admitted that they took no steps to fill in the low area.

In December 2009, the Barretts filed a second amended complaint for negligence, breach of contract, fraud, and injunctive relief against the Defendants.[2] The Barretts alleged that the approval and/or placement of the dirt on Daniel's grave was negligent

---

[2] The Barretts filed a first amended complaint in August 2009.

and reckless and "constitutes an ongoing nuisance since it has caused and continues to cause a significant amount of surface water drainage, flow, and ponding problems as well as other forms of grave desecration." Appellants' App. p. 65. The Barretts also alleged that the defendants were negligent per se because they violated the ordinance to provide perpetual care and proper maintenance on the gravesites. The Barretts asserted that this failure amounted to Logansport's breach of covenant or contract.

The Barretts also advanced a claim for fraud, claiming that Logansport's agreement to maintain the gravesite "in good and proper condition," in accordance with the terms in the Cemetery easement, along with the statement that there were no water drainage problems, caused them to rely on those representations and induced them to purchase the gravesites. Id. at 70. The Barretts also maintained that the Defendants should be compelled to remove all of the fill dirt that was placed on the McDonald gravesite and that they should be enjoined from "causing further harm to Trooper Barrett's gravesite." Id. at 67.

On January 6, 2010, the Barretts filed a motion for summary judgment, alleging that the designated evidence established that the Defendants were negligent, had breached the easement of the burial agreement, and committed fraud as a matter of law. The trial court conducted a hearing, denied the motion for summary judgment, and dismissed the fraud claim on June 4, 2010.

On February 18, 2011, the Defendants filed a joint motion to exclude the Barretts' purported expert witnesses, Shane Hanna and Doug Flin, from testifying at trial. The

7

trial court issued an order finding Hanna's testimony to be admissible under Indiana Rule of Evidence 701, but ordered a hearing regarding the admissibility of Flin's testimony.

On March 3, 2011, the Defendants filed a joint motion for emergency hearing and injunction. More particularly, the Defendants opposed a visit by Flin to Daniel's grave only a few days before the trial was to commence on March 16, 2011, because "this would be akin to hiring an entirely different or new expert in this matter." Appellants' App. p. 817. Furthermore, the Defendants asserted that allowing Flin to visit the gravesite "is clearly contrary to the discovery cut-off date." Id.

In response, the Barretts argued that Flin's visit to the gravesite would not be akin to hiring a different expert because he had previously prepared two written reports that were disclosed to the Defendants on June 22, 2009. The Barretts also pointed out that Flin intended to do nothing more than visually examine the gravesite. Furthermore, the Barretts argued that Flin's visitation of the gravesite would not be contrary to the discovery cut-off date because the Defendants had not requested Flin's deposition. The Barretts asserted that if the Defendants wanted to learn more about Flin's opinions and his intention to subsequently visit the gravesite, the Defendants should have been more diligent in their discovery efforts by requesting Flin's deposition. The Barretts also argued that Flin's visit to the gravesite did not constitute any recognized formal "discovery" under the Indiana Trial Rules because the Cemetery is a public area with no restricted access.

Finally, the Barretts observed that an individual by the name of Issa Dempsey died on February 24, 2011, and was buried on February 26, 2011, in a burial plot just southwest of Daniel's grave in the Cemetery. Dempsey's burial plot is located directly on the large dirt mound that is at issue here. Because the Defendants did not disclose Dempsey's burial to the Barretts, they asserted that the new grave amounted to a spoliation of evidence and the Defendants were attempting to conceal the alteration to prevent Flin from re-assessing the water drainage problems.

The trial court ruled that the "discovery related to Flin has been accomplished and will not include the addition of a personal inspection of the graves in Mount Hope Cemetery." Appellants' App. p. 8. It also determined that if one of the Barretts' witnesses viewed the cemetery for the first time the week before trial, it would force the court to re-open discovery for the Defendants.

A jury trial commenced on March 16, 2011. At some point during the trial, a hearing was held outside the jury's presence to determine whether Flin should be permitted to testify as either an expert or lay witness. Flin testified at this hearing that a cemetery is "specialized landscape" and that there are "a number of different dynamics from a standpoint of maintenance, management, access to burial sites that obviously goes into and influences the planning and design of any kind of burial layout." Appellants' App. p. 1105. Flin emphasized that creating proper water drainage is a major consideration when designing and maintaining cemeteries.

Flin also testified that he has developed over 100 cemeteries in nearly thirty states and other countries, including a recent cemetery in Indiana. Flin is familiar with Indiana statutes that govern the management and operation of cemeteries, including the amount of soil that should be placed on top of graves. Flin stated that when he conducts a site analysis, he examines slopes, drainages, infrastructure, and asks questions. Flin understood the water drainage allegations that involved Daniel's grave.

Although Flin did not visit Daniel's grave, he examined photographs of the gravesite and provided opinions regarding the design and slope. Flin studied a number of pictures of the Cemetery that he had obtained from the internet. He also looked at photographs of the gravesite, answers to interrogatories, and depositions from the parties.

Flin stated that water drainage problems can occur when a different type of soil is added to the top of existing clay soil as in the present case and based on how the dirt is placed. Furthermore, Flin believed that the rim of the dirt mound on the McDonald graves was a concern because it created maintenance and water drainage problems on Daniel's grave. More particularly, Flin stated that the dirt "clearly changed the [water] flow" pattern. Appellants' App. p. 1121. Flin opined that it was inappropriate to place the dirt there and that doing so sets "an extremely poor precedent as far as future burial spaces." Id. at 1115. Flin explained that the water may have taken the path of least resistance by being redirected at a greater velocity around the dirt mound's rim directly on to Daniel's grave. Furthermore, Flin reasoned that the fill dirt can also act like a soft sponge, collect water, and release it on Daniel's grave.

As an alternative to the placement of the fill dirt, Flin recommended that raised granite foundations be placed on the McDonald gravesite to eliminate exposure of the existing concrete foundations. Flin noted that other sections of the Cemetery regularly utilized "more substantial bases" of granite on graves instead of smaller concrete foundations. Id. at 1111. Flin said another alternative could have been to "step" landscape where the fill dirt was placed to eliminate drainage problems. Id.

After hearing the arguments, the trial court ruled Flin's testimony would not be helpful to the jury under either Indiana Rule of Evidence 701 or 702 and excluded him as a witness.

Following the presentation of all the evidence, the Barretts proffered two instructions that the trial court refused to give, regarding damages for grief, pain, suffering, and emotional distress. More particularly, the Barretts requested a final instruction stating in part that that they "have suffered and continue to suffer emotional distress, pain [sic] suffering and grief." Appellants' App. p. 308. Similarly, the Barretts proposed another instruction that addressed the nature and extent of the "injuries," whether the "injuries are temporary or permanent," the "physical pain and mental suffering" the Barretts had experienced and would continue to experience in the future, and "the aggravation of a previous injury or condition." Id. at 25.[3]

The trial court refused to give the instructions because Indiana does not recognize a claim involving grief, pain, suffering and emotional distress as damages in situations

---

[3] The complete text of both of these instructions is fully set out below.

that involve grave desecration. Moreover, the trial court agreed with the Defendants' position that there was no "physical injury" and only "property damage" was at issue. Appellants' App. p. 1278-79. In the end, the trial court agreed with the Defendants and struck out the "emotional distress, pain suffering and grief" language in one of the instructions and rejected the other proposed instruction in its entirety. Id. at 1286-87, 1290.

The Barretts also offered the following instruction regarding spoliation of evidence that the trial court refused:

> Spoliation of evidence is the intentional destruction, mutilation or alteration of evidence. If spoliation by a party to a lawsuit is proved, you may infer that the destroyed, mutilated or altered evidence was unfavorable to that party. For spoliation of evidence to apply, the evidence must be exclusively possessed and must be made unavailable, destroyed, or altered.

Appellants' App. p. 32.

The jury entered a verdict for the Defendants. Thereafter, the Barretts requested that the trial court issue an injunction ordering that the dirt be removed from the McDonalds' family plot. The trial court declined to do so and the Barretts now appeal.

DISCUSSION AND DECISION

I. Summary Judgment

A. Standard of Review

A party is entitled to summary judgment upon demonstrating the absence of any genuine issue of fact as to a determinative issue unless the non-moving party comes forward with contrary evidence showing an issue of fact for trial. Williams v. Tharp, 914

12

N.E.2d 756, 761–62 (Ind. 2009). An appellate court reviewing a trial court summary judgment ruling likewise construes all facts and reasonable inferences in favor of the non-moving party and determines whether the moving party has shown from the designated evidentiary matter that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); Funston v. Sch. Town of Munster, 849 N.E.2d 595, 598 (Ind. 2006). But a de novo standard of review applies where the dispute is one of law rather than fact. Freidline v. Shelby Ins. Co., 774 N.E.2d 37, 39 (Ind. 2002). Summary judgment is rarely an appropriate disposition of actions based on negligence claims. Landau v. Bailey, 629 N.E.2d 264, 266 (Ind. Ct. App. 1994).

### B. The Barretts' Contentions

The Barretts claim that the trial court should have granted their motion for summary judgment because the designated evidence established their causes of action as a matter of law. More specifically, the Barretts maintain that the designated evidence established that the Defendants were negligent per se in the placement, design, and/or construction of the fill dirt on the McDonald gravesite that proximately caused the damages to Daniel's grave. The Barretts further maintain that the designated photographic evidence corroborated their observations that the fill dirt caused significant water drainage problems to Daniel's grave that were not present before the dirt was added.

13

The Barretts also claim that their three experts concluded that the fill dirt altered the flow of water and that the altered flow has and will continue to cause damage to Daniel's grave. Finally, the Barretts claimed that the common enemy doctrine did not apply in this case and requested the trial court to issue injunctive relief ordering the Defendants to immediately remove all of the fill dirt from the McDonald gravesite.

Notwithstanding the Barretts' claims, McDonald directed the trial court to James's deposition testimony that the fill dirt and topsoil added to their gravesite in the fall of 2008 was actually an improvement to it and the surrounding sites because it created a slope that allowed the storm water to run off rather than sit and pond on the sites. McDonald also pointed out that there was no proof suggesting that he or any of the other co-defendants caused the Barretts' alleged injuries. And with respect to proximate cause, McDonald presented evidence that the amount of rain that fell on the Cemetery in 2008 was unpredictable, and that the trier-of-fact would be the appropriate entity to make a determination as to whether there was a direct connection between cause and effect or whether there were too many intervening causes. McDonald also asserted that the Barretts alleged that they have suffered emotional pain and suffering from ponding water on their son's gravesite, and that such alleged damages require proof of an actual injury to recover in a negligence action.

As for the negligence per se claim, McDonald pointed out that the Barretts have failed to provide evidence that the Defendants violated a statute or ordinance. In response to the Barretts' allegation that the common enemy doctrine did not apply,

14

McDonald directed the trial court to his deposition testimony wherein he stated that the grading and leveling he performed actually improved the drainage of storm water over the McDonald and surrounding gravesites and encouraged the absorptions of rain water, thereby eliminating ponding of water in ruts and gullies.

Finally, in response to the Barretts' request for injunctive relief, McDonald replied that granting the Barretts' request would revert the McDonald family plot to a condition where the site was sunken and several inches of the concrete footings were exposed. McDonald also referred to a letter that he wrote to Nicoll on September 11, 2008, which stated that "by reducing the degree of slope, the velocity of the surface water will be reduced, thus allowing more volume of water to be absorbed into the ground. In essence, the stormwater flow to neighboring grave sites to the north has been lessened." Appellants' App. p. 325, 360. McDonald went on to state that

> the original site of the McDonald/Smiljanic family grave site had an existing swale running between the head-stones to the east of the monument. Technically, this swale concentrated stormwater resulting in high velocity and volumes of water flowing north. The new grading plan eliminated the swale resulting in a lesser concentration of stormwater which could result in erosion problems. Also, the regrading will result in a better mowing and site maintenance program for the cemetery.

Id. at 326, 360.

At the hearing on June 4, 2010, the trial court observed that the reason for the fill dirt was potentially to make this foundation look more aesthetically pleasing because it was protruding from the ground. Id. at 848. It was also noted that there was always a downhill grade between the McDonald family plot and the Barrett family plot.

15

In our view, the trial court properly concluded that the designated evidence established that material facts were in existence that prohibited the court from entering summary judgment on behalf of the Barretts.

## II. Fraud Claim

The Barretts next claim that the trial court erred in dismissing their fraud claim. More specifically, the Barretts argue that both Logansport and Nicoll committed fraud in light of their duty to provide perpetual care to the gravesites in accordance with Logansport's easement and burial agreement. The Barretts argue that Nicoll fraudulently induced them to purchase their gravesite easements in light of his representations and promises that Logansport would prevent and maintain water damage problems on the gravesites.

In resolving this issue, we note that the essential elements of actual fraud include a "material misrepresentation of past or existing facts, which representation is false, made with knowledge or reckless ignorance of its falsity, which causes reliance to the detriment of the person relying upon it." First Nat'l Bank of New Castle v. Acra, 462 N.E.2d 1345, 1348 (Ind. Ct. App. 1984).

To maintain their fraud action, the Barretts would have had to establish that, at the time the parties entered into the burial agreement in January 2008, Logansport could have predicted that a nearby grave owner would coordinate with the Cemetery for improvements and, as a consequence of those potential future improvements, the Barretts would somehow become disgruntled or damaged. In short, the Barretts are arguing that

16

Logansport made misrepresentations to them in January 2008 about a matter that had not yet arisen, and of which they could not have had any knowledge. As a result, the Barretts' claim for actual fraud fails.

The Barretts also assert that Logansport and Nicoll should be liable under the doctrine of constructive fraud. Constructive fraud arises by operation of law from a course of conduct that would secure an unconscionable advantage, irrespective of the existence or evidence of actual intent to defraud. Allison v. Union Hosp., Inc., 883 N.E.2d 113, 122 (Ind. Ct. App. 2008). Constructive fraud is based on the premise that there are situations that might not amount to actual fraud, but which are likely to result in an injustice that the law will find a fraud despite the absence of fraudulent intent. Scott v. Bodor, Inc., 571 N.E.2d 313, 324 (Ind. Ct. App. 1991).

The elements of constructive fraud include: (1) a duty existing by virtue of the relationship between the parties; (2) a violation of that duty by the making of deceptive material misrepresentations of the past or existing facts or remaining silent when the duty to speak exists; (3) reliance thereon by the complaining party; (4) injury to the complaining party as a proximate result of the reliance; and (5) the gaining of an advantage by the party to be charged at the expense of the complaining party. Allison, 883 N.E.2d at 123.

When applying the doctrine of constructive fraud to the circumstances here, we note that the Defendants never denied that they owed a duty of perpetual care to the gravesite owners. However, as set forth above, the second element of constructive fraud

17

requires Logansport to have made deceptive material representations of past or existing facts or remained silent when they had a duty to speak. And, as has been suggested, Logansport would have been required to foresee the future in order to advise the Barretts that a nearby plot owner would improve his family's gravesite. Because the events in this circumstance occurred months after the Barretts purchased their family plots, there can be no constructive fraud because there were no "past or existing facts' regarding the condition of the plots, or the water drainage, at the time the parties entered into the burial agreement. Furthermore, the Barretts presented no evidence that any representations about the plots and the burial agreement were made so that the Logansport defendants might gain an advantage at the Barretts' expense. As a result, it was also properly determined that the Barretts could not prevail on a claim for constructive fraud.

### III. Flin's Visit to the Cemetery and Exclusion of His Testimony

The Barretts next maintain that the trial court erred in issuing a preliminary injunction that precluded Flin from visiting the Cemetery prior to trial. Moreover, the Barretts argue that the trial court erred in excluding the testimony of Flin's testimony. The Barretts maintain that the trial court erroneously determined that Flin's testimony would not be helpful to the jury.

We initially observe that a preliminary injunction is an "extraordinary equitable remedy" that should be granted rarely, and only when the law and facts both clearly favor the moving party. Mayer v. BMR Properties, LLC, 830 N.E.2d 971, 978 (Ind. Ct. App. 2005). Whether to grant or deny a motion for a preliminary injunction rests with the trial

court's sound discretion, and we limit our review to whether the trial court clearly abused its discretion.  Id.

Preliminary injunctions are generally used to preserve the status quo as it existed before a controversy, pending a full determination on the merits of the controversy.  U.S. Land Servs., Inc. v. U.S. Surveyor, Inc., 826 N.E.2d 49, 67 (Ind. Ct. App. 2005). To obtain a preliminary injunction, the moving party must demonstrate by a preponderance of the evidence that: (1) its remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (2) the movant has at least a reasonable likelihood of success at trial by establishing a prima facie case; (3) threatened injury to the movant outweighs the potential harm to the nonmoving party resulting from the granting of an injunction; and (4) the public interest would not be disserved.  City of Gary v. Mitchell, 843 N.E.2d 929, 933 (Ind. Ct. App. 2006).

If the movant fails to prove any of these requirements, the trial court should deny a request for a preliminary injunction.  Apple Glen Crossing, LLC v. Trademark Retail, Inc., 784 N.E.2d 484, 487 (Ind. 2003).  The power to issue a preliminary injunction should be used sparingly, and such relief should not be granted except in rare instances where the law and facts are clearly within the moving party's favor.  Barlow v. Sipes, 744 N.E.2d 1, 5 (Ind. Ct. App. 2001).

In this case, the Defendants requested a preliminary injunction following their objection to Flin's possible visit to the Cemetery only days before trial.  Notiwithstanding the Defendants' contentions, they were aware of Flin's opinions for nearly two years

19

prior to trial. Flin formulated his opinions about the gravesite after reviewing numerous photographs that depicted the water drainage problems, scientific reports prepared by experts, and discovery responses.

Flin prepared two written reports that were disclosed to the Defendants on June 22, 2009. That same day, the Barretts served the Defendants with interrogatory answers wherein they identified Flin as an expert witness who they intended to call to testify at trial. Flin intended to do nothing more than visually examine the gravesite that would have added value to his testimony by assisting the jury. If the Defendants desired to learn more about Flin's opinions and his intention to subsequently visit the gravesite, they could have requested his deposition. More importantly, we cannot say that Flin's proposed visit to the gravesite did not constitute any recognized formal "discovery" under the Indiana Trial Rules. The Cemetery is a public entity and the evidence shows that Flin did nothing more than intend to examine the graves. As a result, we conclude that the trial court erred in granting the Defendants' preliminary injunction, thus prohibiting Flin from visiting the area prior to trial.

### A. Flin's Testimony

As for the trial court's decision to disallow Flin from testifying at trial, we note that the decision to admit or exclude evidence is within the trial court's discretion, and we will review the trial court's decision for an abuse of discretion. Lachenman v. Stice, 838 N.E.2d 451, 464 (Ind. Ct. App. 2005). An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before it, or

the reasonable, probable, and actual deductions to be drawn therefrom. <u>Wallace v. Meadow Acres Mfrd. House., Inc.</u>, 730 N.E.2d 809, 812 (Ind. Ct. App. 2000).

Although a witness may not be qualified to offer expert testimony under Indiana Evidence Rule 702, the witness may still be qualified as a "skilled witness" (sometimes referred to as a "skilled lay observer"). Ind. Evid. R. 701; <u>Warren v. State</u>, 725 N.E.2d 828, 831 (Ind. 2000). A skilled witness is a person with "a degree of knowledge short of that sufficient to be declared an expert under Indiana Evidence Rule 702, but somewhat beyond that possessed by the ordinary jurors." Robert Lowell Miller, Jr., 13 Indiana Practice, Indiana Evidence § 701.105, at 318 (2d ed. 1995). Under Indiana Evidence Rule 701, a skilled witness may provide an opinion or inference that is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Ind. Evid. R. 701. The requirement that the opinion be "helpful" means, in part, that the testimony gives substance to facts that are difficult to articulate. <u>Hanson v. State</u>, 704 N.E.2d 152, 155 (Ind. Ct. App. 1999). Skilled witnesses not only can testify about their observations, they can also testify to opinions or inferences that are based solely on facts within their own personal knowledge. <u>Cansler v. Mills</u>, 765 N.E.2d 698, 703 (Ind. Ct. App. 2002). Testimony under Indiana Rule 701 "generally needs only rise to a relatively low bar in order to be admissible." <u>Hawkins v. State</u>, 884 N.E.2d 939, 945 (Ind. Ct. App. 2008).

In this case, the trial court held a hearing outside the presence of the jury to determine if Flin was qualified to give testimony under Indiana Rule of Evidence 701.

21

Flin's testimony was based on his perception of the evidence that he reviewed and his extensive experience as a landscape architect that specialized in cemetery design. Indeed, Flin's testimony demonstrated that he had significant expertise in cemetery design beyond that of the ordinary juror. More particularly, Flin established that cemeteries are designed unlike other types of property, and they may have complex issues involving water drainage. The Defendants did not dispute Flin's expertise in this area, and although Flin did not visit Daniel's grave, he had reviewed maps, discovery, and many photographs of the gravesite.

Moreover, the record establishes that Flin's proposed testimony was helpful to a clear understanding of the determination of a fact in issue, i.e., whether it was appropriate to place the fill dirt near Daniel's grave. More particularly, Flin's testimony would have assisted the jury in demonstrating how cemeteries are specially designed property with unique landscape concerns. That testimony was needed in light of Nicoll's testimony that no objective standards existed regarding cemetery maintenance/alteration of topography. Appellant's App. p. 148. Likewise, there were no guidelines as to who was qualified to place dirt on graves. Id. at 1211-12. That said, the jury might not have been able to fully understand the water drainage issues in the absence of Flin's testimony. As a result, we must conclude that the trial court erred in excluding Flin's testimony.

However, notwithstanding this determination, we note that both of the Barretts testified as to what they observed in relation to water runoff. They also offered their opinions as to why the incident had occurred. Tr. p. 93-160; 212-34. The jury was also

22

permitted to view the site and numerous photographs and exhibits. Appellants' App. p. 1367-1422; tr. p. 307-09. In fact, all of the witnesses who testified at trial, except for Flin, actually viewed the site in person.

It was established that Hanna, another one of the Barretts' experts, inspected Daniel's grave on two occasions. He had prepared a report and concluded that the dirt was improperly placed on and around the McDonald gravesite. Appellants' App. p. 254. Hanna determined that the dirt caused rain water to be discharged from the McDonald gravesite in new, well-defined channels that resulted in larger quantities of water to be discharged onto Daniel's grave. Id. Hanna opined that the greater quantities of water from the artificially created channels "have caused and will cause water ponding, significant soil erosion and other water drainage-related problems leading to grave desecration and other forms of damage to Daniel's grave." Id. at 254-55. Hanna was also of the opinion that "there are . . . larger quantities of water being absorbed underneath the surface of Daniel's grave during rain that are not visible to the naked eye of a person looking at the grave." Id. at 255.

Dutill, another witness for the Barretts, is a registered professional engineer and concentrates his expertise in issues involving the environment, stormwater, and flooding. Id. at 289. In early 2009, Dutill evaluated water drainage problems regarding Daniel's grave and generated a written report. Dutill opined, as a civil and environmental engineer, that the "placement and/or construction of the fill dirt was improper on the nearby gravesite owned by Betty McDonald." Id. at 290. Dutill also testified that the

23

"fill dirt has caused and will likely continue to cause water from rain to be regularly discharged on Daniel Barrett's grave in new, defined channels so as to amplify the force of water flow toward and on [Daniel's] grave." Appellants' App. p. 290.

Dutill determined that "[t]he greater quantities of water from the artificial channels have caused and will likely cause water ponding, soil erosion, and possibly other water drainage-related problems leading to improper conditions at and surrounding Daniel's grave." Id. at 290. Dutill further determined that "[i]t is highly likely that there are also larger quantities of water being absorbed underneath the surface of Daniel's grave during and after rain that are not visible to the naked eye of a person looking at the grave." Id. Dutill explained that "[o]ver time, the excess water under the surface may expedite the breakdown and/or damage of the grave vault/casket containing [Daniel's] grave." Id. Finally, Dutill concluded that "all of the fill dirt be removed from the McDonald graves in order to remedy the water drainage problems as it pertains to Daniel Barrett's grave." Id.

When considering Dutill and Hanna's testimony, we cannot say that the exclusion of Flin's testimony and the trial court's prohibition of him from visiting the gravesite amounted to reversible error. Indeed, we have previously held that erroneously excluded evidence requires reversal only if the error relates to a material matter or substantially affects the rights of the parties, and any error in the admission of evidence is harmless if the same or similar evidence is submitted without objection. In re Estate of Holt, 870 N.E.2d 511, 515 (Ind. Ct. App. 2007).

24

Here, the jury heard evidence from the Barretts and the other witnesses about the condition of Daniel's grave and the effect that the fill dirt had on it. Both Hanna and Dutill offered testimony establishing that the fill dirt was improperly placed on and around the gravesite and has caused damage. Appellants' App. p. 254-55, 290. As a result, we conclude that the trial court's exclusion of Flin's testimony and the denial of the Barretts' request for Flin to visit the gravesite did not amount to reversible error.

## IV. Jury Instructions

### A. Spoliation of Evidence

The Barretts argue that the trial court erred in refusing to give their proposed instruction regarding the spoliation of evidence. More particularly, the Barretts maintain that the instruction should have been given because another burial easement that was sold altered the disputed area where the fill dirt was added. The Barretts maintain that Logansport and Nicoll[4] intentionally altered the area by allowing the new grave to be placed directly on the dirt mound.

We note that the purpose of jury instructions is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair and correct verdict. Blocher v. DeBartolo Props. Mgmt., Inc., 760 N.E.2d 229, 235 (Ind. Ct. App. 2001). In reviewing a trial court's decision to give or refuse a tendered instruction, it must be determined whether the instruction: (1) correctly states the law; (2) is supported by the evidence in the record;

---

[4] McDonald has not responded to this issue the Barretts acknowledge that Logansport had exclusive custody and control of the gravesite area. Appellants' Br. p. 32-33.

and (3) is covered in substance by other instructions. <u>Wal-Mart Stores, Inc. v. Wright</u>, 774 N.E.2d 891, 893 (Ind. 2002). If the challenge to a jury instruction is that it does not correctly state the law, we will review the instruction de novo, but if the challenge is that the instruction is not supported by the evidence in the record or that the substance is not covered by other instructions, we will reverse only if the trial court has abused its discretion. <u>Id.</u> at 893-94.

To find an abuse of discretion, it must be determined that the instructions as a whole misstate the law or otherwise mislead the jury. <u>Smock Materials Handling Co. v. Kerr</u>, 719 N.E.2d 396, 402 (Ind. Ct. App. 1999). Errors with regard to instructions are harmless and do not require reversal where the verdict would have been no different had the jury been properly instructed. <u>Id.</u>

Turning to the circumstances here, we note that spoliation of evidence consists of "the intentional destruction, mutilation, alteration, or concealment of evidence, usually a document. If proved, spoliation may be used to establish that the evidence was unfavorable to the party responsible." <u>Cahoon v. Cummings</u>, 734 N.E.2d 535, 545 (Ind. 2000) (quoting BLACK'S LAW DICTIONARY 1409 (7th ed. 1999)). In Indiana, the exclusive possession of facts or evidence by a party, coupled with the suppression of the facts or evidence by that party, may result in an inference that the production of the evidence would be against the interest of the party which suppresses it. <u>Porter v. Irvin's Interstate Brick & Block Co.</u>, 691 N.E.2d 1363, 1364-65 (Ind. Ct. App. 1998).

26

Notwithstanding the Barretts' contention that their spoliation of evidence instruction should have been given, the evidence demonstrates that the Barretts never asked the Cemetery to preserve the scene by not selling any nearby gravesites. Even more compelling, the mere fact that a burial occurred behind Daniel's grave shortly before the 2011 jury trial commenced, in no way amounted to "the intentional destruction, mutilation, alteration or concealment of evidence." Cahoon, 734 N.E.2d at 545.

The Barretts have also made no showing that Logansport suppressed any of the facts or evidence in this case. Indeed, the Barretts regularly visited the gravesite and they advance no contention that they were ever prevented or prohibited from being there. In short, the evidence fails to show that selling a new gravesite amounted to the spoliation of evidence. Therefore, the trial court did not err in refusing to give this proposed instruction.

## B. Grief, Pain, Suffering, and Emotional Distress

The Barretts next argue that the trial court erred in refusing to give their proposed instruction on awarding monetary damages for grief, pain, suffering and emotional distress that related to their observations of the desecration of Daniel's grave. Specifically, the Barretts maintain that the trial court's determination that such damages are not recoverable in these circumstances was error, and that damages should be permitted because there is clear legislative intent that the safety and sanctity of human graves should receive protection.

27

The two instructions that the Barretts offered that the trial court refused to give are as follows:

PLAINTIFFS' AMENDED FINAL ISSUE INSTRUCTION IMCJI No. 109 - Issues for Trial

. . .

The Barretts claim that the City of Logansport, Michael Nicoll and James McDonald were negligent in the placement of the fill soil and peat moss on and around the McDonald gravesite. The Barretts further contend that the City of Logansport breached its contract to provide perpetual care to Daniel Barrett's grave. As a result of the negligence and breach of contract, the Barretts claim that Daniel Barrett's grave has sustained and continues to sustain damages. Furthermore, the Barretts claim that they have suffered and continue to suffer emotional distress, pain suffering and grief. The Barretts must prove their claims by the greater weight of evidence. [parts omitted]

Appellants' App. p. 39.

PLAINTIFFS' FINAL INSTRUCTION IMCJI No. 703 (General Elements of Damages)

If you decide from the greater weight of the evidence that the City of Logansport, Michael Nicoll and/or James McDonald is/are liable to Vincent Barrett and Sarah Barrett, then you must decide the amount of money that will fairly compensate Vincent Barrett and Sarah Barrett.

In deciding the amount of money you award, you may consider:

(1) the nature and extent of the injuries, and the effect of the injuries on Vincent Barrett and Sarah Barret's ability to function as a whole person;

(2) whether the injuries are temporary or permanent;

(3) the physical pain and mental suffering Vincent Barrett and Sarah Barrett have experienced and will experience in the future as a as a result of the injuries; and

(4) the aggravation of a previous injury or condition.

Appellant's App. p. 25. As discussed above, the trial court struck the "emotional distress, pain suffering and grief" language in Instruction number 109, and refused to give Instruction 703 in its entirety.

In addressing the Barretts' contentions, we note that in Shuamber v. Henderson, 579 N.E.2d 452 (Ind. 1991), our Supreme Court determined that when a plaintiff sustains a direct impact by the negligence of another and, by virtue of that direct impact, sustains emotional trauma that is serious in nature, the plaintiff is entitled to maintain an action to recover for the emotional trauma, without regard to whether the emotional trauma was due to any physical injury. Thereafter, in Groves v. Taylor, 729 N.E.2d 569 (Ind. 2000), a bystander rule for recovery in claims of emotional distress was recognized and three factors had to be considered before one might recover as a bystander:

> First, "[a] fatal injury or a physical injury that a reasonable person would view as serious can be expected to cause severe distress to a bystander. Less serious physical harm to a victim would not ordinarily result in severe emotional distress to a reasonable bystander of average sensitivity.

> Second, emotional distress may accompany the death or server injury of persons such as friends, acquaintances, or passerby. But the emotional trauma that occurs when one witnesses the death or severe injury of a loved one with a relationship to the plaintiff analogous to "a spouse, parent, child, grandparent, grandchild, or sibling is unique in human experience and such harm to a plaintiff's emotional tranquility is so serious and compelling as to warrant compensation." Limiting recovery to those plaintiffs who have the

29

specified relationships with the victim acknowledges the special quality of such relationship yet places reasonable limit on the liability of the tortfeasor.

Third, "[w]itnessing either an incident causing death or serious injury or the gruesome aftermath of such an event after it occurs is an extraordinary experience, distinct from the experience of learning of a loved one's death or severe injury by indirect means.

Id. at 572-73.

In addition to construing the rule announced in above, we find the circumstances in York v. Fredrick, 947 N.E.2d 969 (Ind. Ct. App. 2011), instructive here. In York, it was determined that although damage had occurred to the casket of a loved one, the plaintiffs were not directly involved in the alleged injury and did not witness the decedent's death or any severe injury to her. As a result, no claim for negligent infliction of emotional distress could be made. Id. at 974.

Similarly, the Barretts have not witnessed any injury to Daniel's remains, and it is merely speculation by the Barretts that any injury has occurred. Tr. p. 93-160, 212-34. No testimony was presented and no discovery revealed that the Barretts had sustained physical or mental injuries as a result of the dispute with the Defendants in this case. Indeed, it is undisputed that neither of the Barretts had sustained any physical injury at the site. The Barretts also made no claim for counseling and therapy, physical injuries, or mental suffering. And they presented no evidence that would support a request for property damage, such as for the cost of making whatever repairs they believed were

necessary to improve the site.[5]  That said, based upon the facts presented here, we conclude that the trial court correctly refused the Barretts' proffered instructions regarding damages for grief, pain and suffering, and emotional distress.

## V.  Preliminary Injunction

Finally, the Barretts contend that the trial court erred in denying their independent request for injunctive relief, i.e., the removal of the dirt, notwithstanding the verdict in the Defendants' favor.  In essence, the Barretts claim that public policy weighs in favor of granting injunctive relief in situations such as the present case.  Therefore, the Barretts contend that the trial court should have issued a permanent injunction by ordering the removal of the dirt.

We note that permanent injunctions are limited to prohibiting injurious interference with rights.  Ferrell v. Dunescape Beach Club Condos. Phase I, Inc., 751 N.E.2d 702, 712 (Ind. Ct. App. 2001).  The grant or denial of an injunction lies within the sound discretion of the trial court and will not be overturned unless it was arbitrary or amounted to an abuse of discretion.  Id.  A trial court abuses its discretion when its decision is clearly against the logic and effect of the facts and circumstances, or if it misinterprets the law.  Shipley v. Keybank Nat'l Assn., 821 N.E.2d 868, 880 (Ind. Ct. App. 2005).

---

[5] As an aside, we reject the Barretts' reliance on Meek v. State, 205 Ind. 102, 185 N.E. 899 (1933), to support their claim that "there is a viable cause of action involving grave protection and the sanctity of the deceased."  Appellants' Br. p. 36.  Notwithstanding this contention, the circumstances in Meek are distinguishable from those here, because the circumstances in Meek involved a criminal matter in which a widow received letter threatening to deliberately desecrate her dead husband's remains.  In that case, the court was assessing whether the acts of the accused satisfied the elements of the charged offense.

The trial court considers four factors in determining the propriety of permanent injunctive relief: (1) whether the plaintiff has succeeded on the merits; (2) whether plaintiff's remedies at law are adequate; (3) whether the threatened injury to the plaintiff outweighs the threatened harm a grant of relief would occasion upon the defendant; and (4) whether the public interest would be disserved by granting relief. Ferrell, 751 N.E.2d at 712.

Notwithstanding the Barretts' contentions that they should be granted injunctive relief, they did not prevail on the merits of their claims. Moreover, the Barretts presented no evidence that the condition at the gravesite constituted a threatened injury, and there was no evidence that the public interest would be served by ordering the removal of the topsoil and mature grass around the McDonald gravesite. Therefore, we reject the Barretts' claims that the trial court had any independent duty to determine whether a permanent injunction should have been issued.

## CONCLUSION

In light of our discussion above, we conclude that the trial court properly denied the Barretts' motion for summary judgment and dismissed their fraud claim. The Barretts' tendered instructions as to spoliation of evidence and grief, pain, and emotional distress were properly denied, as was the Barretts' claim for injunctive relief. Finally, although the trial court erred in denying the Barretts' request for Flin's visit to the Cemetery prior to trial and in excluding his testimony at trial, we conclude that the

32

Barretts were not prejudiced to the extent that reversal is warranted in light of the cumulative evidence that was presented.

The judgment of the trial court is affirmed.

DARDEN, J., and BAILEY, J., concur.