**FOR PUBLICATION**


FILED
Sep 30 2013, 5:39 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**DONALD F. FOLEY**
Foley & Abbott
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**PETER S. KOVACS**
Peter Kovacs Law PC
Fishers, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JOSEPH M. GUINN, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1303-CC-239 |
| | ) | |
| APPLIED COMPOSITES | ) | |
| ENGINEERING, INC., | ) | |
| | ) | |
| Appellee. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Cynthia J. Ayers, Judge
Cause No. 49D04-1009-CC-42922

**September 30, 2013**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

Joseph M. Guinn appeals the trial court's summary judgment ruling in favor of Applied Composites Engineering, Inc. ("ACE") as to Guinn's claim for tortious interference with a contract. Guinn raises one issue, which we revise and restate as whether the court erred in granting summary judgment in favor of ACE. We reverse and remand.

FACTS

Guinn is an airline mechanic who holds a Federal Aviation Administration ("FAA") airframe and powerplant ("A&P") mechanic's license. ACE is a supplier of aviation and aerospace products and services. On March 27, 2008, Guinn began to work for ACE as an A&P Technician at the A&P composite repair site.

ACE and Guinn entered into a Confidentiality, Non-Competition, and Non-Solicitation Agreement dated January 22, 2009 (the "Agreement"). Paragraph 8 of the Agreement set forth a "Non-Competition Covenant" which provided in part that Guinn agreed that, for a period of six months following the termination of his employment for any reason, he would not "directly or indirectly, act as, or become a principal, agent, stockholder, director, officer, investor, manager, trustee, representative, employee, counselor, or in any other relation or capacity whatsoever anywhere within a radius of fifty (50) miles of any [ACE] facility, engaged [sic] in the same or substantially similar business as [ACE]." Appellant's Appendix at 115. Paragraph 8 also provided in part that Guinn "unconditionally agrees that the time, geographic territory and business activities limitations defined and contained herein are all reasonable and meant to be fully binding in all respects" and that "the provision of Paragraph 8 shall survive the termination of

2

employment." Id. All employees of ACE were required to sign such agreements. Richard Sohnle, ACE's vice president of operations, told Guinn that the Agreement was a formality and "that it was something that didn't necessarily apply to A&P[ mechanics] [a]nd it needed to be on company file." Id. at 164.

In early August of 2010, Guinn applied for employment with AAR Aircraft Services, Inc. ("AAR") to work as a mechanic because AAR operated a second shift, and ACE did not.[1] AAR is a provider of products and services to the commercial aviation and government/defense industries and maintained a maintenance, repair, and overhaul facility at the Indianapolis International Airport. ACE was a vendor or customer of AAR.[2] Guinn received a letter containing an offer of employment from AAR dated August 3, 2010 to be an A&P technician, and he accepted the offer by signing the letter and dating it August 5, 2010. On August 12, 2010, Guinn provided ACE with a two-week notice that he intended to leave his position.[3] At the time, he was told that he may not "be able to leave with a no-compete clause that [ACE] ha[d] in place."[4] Id. at 95.

---

[1] In his deposition, Guinn indicated that he wished to work the second shift so that he would be home with his children during the day while his wife worked.

[2] Specifically, the evidence designated by Guinn shows that Randy Sutterfield, who worked as a director for a subsidiary of AAR, indicated during his deposition that ACE was a vendor of AAR. Guinn's designated evidence also includes an e-mail message between two AAR employees dated September 14, 2010 indicating that ACE is one of AAR's customers.

[3] When asked during his deposition how much longer he worked after August 12th, Guinn stated: "They let me go a little before, I would say a week before. It was a Saturday, so I would say a full week before the 26th. And they paid me through that." Appellant's Appendix at 95. Guinn then clarified that he was paid by ACE through August 26th.

[4] The page of Guinn's deposition testimony from which this fact is taken, which was included in ACE's designated evidence, does not indicate the name of the person who made this statement to Guinn.

3

On August 16, 2010, Drew Cherry with ACE sent a copy of the Agreement by fax to Jami Burdine, who worked in the human resources department at AAR. At some point before Guinn reported for work, Randy Sutterfield, a director of a subsidiary of AAR, received a phone call from Leigh Sargent, the President of ACE, and Sargent told Sutterfield that "Guinn was under the terms of a non-compete agreement and that he believed that it was a violation from [sic] him to come work for [AAR]."[5] November 15, 2010 Transcript at 56. Also at some point before Guinn's first day of work, Burdine called Guinn and told him that ACE had sent the non-compete clause to AAR, that it could potentially affect his employment opportunities with AAR, and that she would have to send it to AAR's legal department. Burdine communicated by email with Bonita Surges, a senior human resources manager at AAR, regarding Guinn's employment.[6] Sutterfield informed ACE that it would not employ Guinn due to the Agreement.[7] Guinn was not informed by AAR that he should not report for work as scheduled, and he commenced his employment with AAR on August 30, 2010.

On September 3, 2010, ACE received a request by fax from FirstLab, a company that conducted background checks, for background information related to Guinn. On

---

[5] The designated evidence reveals that this call occurred "after Mr. Guinn had interviewed and been offered a position [at AAR] and before he reported for work." November 15, 2010 Transcript at 56.

[6] In her deposition, Surges stated that there was a miscommunication between her and Burdine. Surges stated: "[Burdine] sent me an e-mail about this should be – something to the effect this should be between the employee and the company. And I said absolutely, but to me absolutely means stay out of it, stay away from it, leave it alone. She interpreted it differently." Appellant's Appendix at 100. When asked whether "[Burdine] interpreted it as in okay to go ahead and hire him," Surges stated "[s]he did." Id.

[7] As discussed later, a subsequent e-mail message from a human resources administrator to Surges stated in part that Sutterfield "told ACE in an email that [AAR] would not hire [Guinn]." Appellant's Appendix at 150.

4

September 10, 2010, Cherry with ACE sent a message to FirstLab by fax which stated: "Joe Guinn is under a Non-Compete Agreement, and AAR informed us that their employment offer for Joe Guinn was revoked." Appellant's Appendix at 122.

At some point on or prior to September 14, 2010, Sutterfield received another call from Sargent wherein Sargent stated that AAR had told him that AAR would not hire Guinn as long as the Agreement was in place, and that Guinn "would be required to have a letter from ACE absolving [him] of that contract," that AAR "did not do what [it] said [it was] going to do," and that AAR "did hire [Guinn] and he had been working for [it] for a few weeks."[8] November 15, 2010 Transcript at 59.

On September 14, 2010, a human resources administrator with AAR sent an e-mail message to Surges which stated in part:

> FYI . . . [Sutterfield] just came and asked if we had hired Joseph Guinn. [Guinn] started as a regular full time employee on August 30th.
>
> [Sutterfield] said he copied and pasted information you provided and told ACE in an email that we would not hire this individual. According to [Sutterfield], the offer of employment was supposed to be rescinded and [Sutterfield] is now being contacted by ACE ([Guinn's] former employer and one of our customers) and they are very upset because we went back on our word.

Appellant's Appendix at 150.

On September 17, 2010, Sutterfield sent an e-mail message to Sargent which stated: "Our HOUR Director can meet with us Tuesday at 9:30 am. Will that work for you? If so I will arrange it and send a meeting notice?" Id. at 144. Sargent sent a

---

[8] The designated evidence reveals that, when asked if "there was a second contact by ACE to you after Mr. Guinn began employment with AAR," Sutterfield stated "I received a call from [] Sargent who stated that he believed that Mr. Guinn was working for us . . . ." November 15, 2010 Transcript at 59.

response message to Sutterfield which stated: "I am in Florida Tuesday. Since we spoke some other events have ce [sic] to light, I suggest you call on my cell . . . ." Id.

On September 21, 2010, Sutterfield sent an e-mail message to Sargent which said: "Just got out of a meeting with the Director of HR and our Corporate. [Guinn] will be terminated and be told that he is free to apply after the terms of his non compete expire. Our director will contact you directly once this is complete." Id. at 149.

On September 24, 2010, Sargent sent an e-mail message to Sutterfield which stated in part: "Have not heard from your director so I have directed council [sic] to file." Id. at 148. Later that day, Sutterfield forwarded Sargent's message to Surges, and Surges sent an e-mail message to Sargent which stated:

> First of all, please allow me to apologize for our error in hiring Mr. Guinn as a result of a miscommunication. I personally have extensive experience with non-competes and have a strong personal belief in honoring them.
>
> Secondly, I have received final clearance from our legal department this morning to proceed with the termination of Mr. Guinn's employment. He is working our second shift (Wednesday through Saturday) and will be here at 4pm today. At that time, we will meet with him to inform him of our action.
>
> My hope is that this course of action is agreeable to you. Now that I have your contact information, I will be happy to send you an email when we have completed that meeting so you have documentation it is complete.

Id. Later in the day, AAR terminated Guinn's employment. During his deposition, Sutterfield stated in part:

> I think that the actions taken by AAR were all aboveboard, were in the best interest of AAR, and what we believed to be in the best interest of ACE at the time. That we were complying with our vendor's request, and had it not been for some small form of communication, this whole thing would not have happened. Or if it had happened, it wouldn't be between -- or we would not be involved, that in order for the business relationship between

6

ACE and a personal relationship between us to continue, we have to remain neutral. This is about business.

Id. at 167-168.

PROCEDURAL HISTORY

1. ACE's Complaint and Guinn's Counterclaim

On September 30, 2010, ACE filed a complaint against Guinn and AAR alleging breach of contract against Guinn for accepting employment with AAR, and tortious interference with a contract against AAR for employing Guinn despite knowing of the existence of the Agreement, and for inducing Guinn to breach the Agreement. On October 20, 2010, Guinn filed an answer together with affirmative defenses and a Verified Counterclaim for Injunctive Relief and Damages. In his counterclaim, Guinn alleged that ACE wrongfully deprived him of his right to employment as an A&P airline mechanic in the metropolitan Indianapolis area, and requested, under Count I, that he be granted injunctive relief; under Count II, he requested that the court declare the Agreement invalid and void; under Count III, he alleged that ACE committed tortious interference with a contractual relationship, intentionally acted to induce a breach of the contractual relationship between Guinn and AAR, and was without justification to do so; under Count IV, he alleged that ACE blacklisted him to prevent him from obtaining employment; and under Count V, he alleged that ACE wrongfully deprived him of his livelihood and is liable for treble damages under Ind. Code § 34-24-3-1. In its answer to ACE's complaint, AAR asserted additional defenses alleging that ACE lacked a legitimate interest to be protected through the enforcement of the Agreement, that the Agreement was vague and ambiguous and did not provide Guinn with a clear

7

understanding of what conduct was prohibited, and that the Agreement was invalid and unenforceable as against the public policy of the State of Indiana.

    2.    Count I of Guinn's Counterclaim

On November 15, 2010, the court held a hearing regarding Guinn's request for a preliminary injunction. During the hearing, when asked "[w]hat information, if any, did Mr. Guinn have . . . has today that is confidential and not readily available in the marketplace by legal means," Sargent responded that "[o]ne would be certain techniques within a repair composite." November 15, 2010 Transcript at 115. When asked "I don't understand[;] [Guinn is] an FAA airline mechanic, and that's the work he does, but you claim to have some kind of unique proprietary interest in this man's personal skills that would prevent him from working in the industry that does repair work for airlines," Sargent stated "No," and when asked to "[b]e as specific about what you claim your proprietary interest is," Sargent stated "investment and costs in the training." Id. On December 23, 2010, the court issued an order denying Guinn's request for injunctive relief, finding that although Guinn's financial situation was perilous at the moment, he had an adequate remedy at law, that he was able to calculate his damages precisely, and that the damages include readily documentable claims for lost wages, attorney fees, and other costs associated with his termination from AAR. Guinn initiated an interlocutory appeal in January 2011 but withdrew the appeal in June 2011.[9]

---

[9] In his appellant's brief, Guinn states that he withdrew the appeal because "the term of ACE's non-competition covenant had expired while the appeal was pending, rendering issuance of the preliminary injunction moot." Appellant's Brief at 2.

### 3. Counts II, IV, and V of Guinn's Counterclaim

On August 18, 2011, ACE filed a motion for judgment on the pleadings.[10] On September 12, 2011, Guinn filed a motion for partial summary judgment on Count II of his counterclaim requesting that the court declare the Agreement invalid and void. In the motion, Guinn argued that the non-competition covenant restricts Guinn "from performing *any kind of work whatsoever* for any other company engaged in the same or substantially similar business as ACE, while failing to identify either the nature of the work that Guinn performed for ACE or the nature and scope of ACE's business activities," and that "ACE does not have a protectable interest in prohibiting Guinn, an FAA mechanic, from working for a competitor, because (a) ACE cannot show that its advanced composite processes are any different from its competitors' processes, and (b) the work performed by Guinn is required by law to comply with FAA guidelines and specifications." Appellant's Appendix at 61.

On November 9, 2011, the court entered an order of dismissal with prejudice based on a joint stipulation filed by AAR and ACE that AAR would be dismissed from the case.

On January 11, 2012, the court entered an amended order granting Guinn's motion for partial summary judgment and granting ACE's motion for judgment on the pleadings. With respect to Guinn's motion for partial summary judgment on Count II of his counterclaim, the court found that the non-competition provision of the Agreement was overbroad. Specifically, the court found that "[t]he non-competition covenant in this case

---

[10] This motion is not contained in the record.

9

did not specify what type of work Guinn did for ACE or what Guinn was prohibited from doing with anyone else" and that "the Agreement appears to have been drafted in such a manner as to apply to *any employee* in *any capacity*." Id. at 68. With respect to ACE's motion for judgment on the pleadings, the court noted that ACE's motion related to Counts IV and V of Guinn's counterclaim, that with respect to Count IV the blacklisting statute did not apply in this case, and with respect to Count V that Guinn was not entitled to damages under Ind. Code § 34-24-3-1 as alleged. Accordingly the court granted summary judgment in favor of ACE on Counts IV and V of Guinn's counterclaim.

  4.  <u>ACE's Summary Judgment Motion on Count III of Guinn's Counterclaim</u>

  On October 23, 2012, ACE filed a motion for summary judgment on Count III of Guinn's counterclaim together with its designation of materials and a brief in support of its motion. In its brief, ACE argued that when it communicated the existence of the Agreement to AAR, there was no valid and enforceable contract to breach and that Guinn could not show an absence of justification. Guinn filed a response to ACE's summary judgment motion together with his designation of evidence. He argued that a valid and enforceable agreement existed between him and AAR, that AAR made an offer of employment on August 3, 2010, he accepted the offer on August 5, 2010, and he actually worked for AAR from August 30, 2010 through September 24, 2010. Guinn also argued that a material issue of fact exists as to whether ACE's contacts with AAR demanding that AAR terminate Guinn's employment were justified. Specifically, Guinn argued that Sargent, ACE's President, communicated with AAR multiple times in an effort to convince AAR to terminate his employment, and that "[t]his pattern goes further to

10

support a finding of malice than it does to support a finding of justification." Id. at 131. Guinn also argued that ACE cannot rely on the assertion that Sargent believed the Agreement was enforceable, that the question of whether an employer's conduct in interfering with a former employee's contract is "justifiable" rests primarily on whether the employer's conduct was fair and reasonable under the circumstances, and that, when asked to identify ACE's proprietary interest in preventing Guinn from taking other employment, Sargent stated "investment and costs in the training." Id. at 132 (citation omitted). ACE filed a reply to Guinn's response to its second motion for summary judgment in which it argued that it merely informed AAR of the existence of the Agreement, that AAR formed its own independent conclusions that it would not hire Guinn, and that there is no testimony that Sargent demanded Guinn be terminated when he spoke with AAR. ACE also contended that there is no evidence that its contacts with AAR were unjustified, that ACE reasonably believed the Agreement was enforceable, and it transmitted the Agreement to AAR so that AAR could determine for itself what it would do. On January 23, 2013, the court held a hearing on the summary judgment motion at which the parties presented arguments.

5.     The Trial Court's Summary Judgment Ruling on Count III

On February 15, 2013, the court issued an order granting ACE's motion for summary judgment which included findings of fact and conclusions of law. In its findings, the court noted that it had found the Agreement to be invalid and unenforceable on January 11, 2012 because it was overbroad, that ACE notified AAR on August 16, 2010 that Guinn was bound by the Agreement, and that Guinn reported to work for AAR

11

on August 30, 2010 and worked there continuously until September 24, 2010, when he was terminated. The court also found that ACE, through its president, Sargent, "contacted AAR employees on multiple occasions between September 10, 2010 and September 24, 2010, inquiring as to why Guinn was working for AAR," that "[t]hereafter, there was email communications on September 17, 2010, September 21, 2010 and September 24, 2010 between ACE and AAR about whether AAR was going to terminate Guinn," that "[o]n September 24, 2010, Sargent e-mailed AAR" and "[h]e had still not received confirmation from AAR's Human Resources Director that Guinn had been terminated," that "[h]e revealed that he had directed his attorney to file this lawsuit, which had originally named AAR was a co-defendant," and that "AAR was subsequently dismissed from the case on November 09, 2011." Id. at 15.

In its conclusions of law, the court found that Guinn had an at-will employment relationship with AAR from the time he accepted AAR's written offer of employment on August 3, 2010, even though he did not report to work until August 30, 2010, and that "ACE made several attempts both before and after Guinn reported for work at AAR to pressure AAR to terminate its employment relationship with Guinn." Id. The court noted the factors set forth by the Restatement (Second) of Torts § 767 with respect to whether a party's conduct in intentionally interfering with a contract is justified. The court's order then provides:

> In this case, ACE's Non-Compete Agreement had legal defects when it was signed by Guinn; however that fact was unknown to ACE at the time. The question of whether or not the contract was enforceable had not yet been tested in a court of law. ACE had reason to believe that Guinn was, in fact, acting in violation of said non-compete agreement. It follows then that ACE's conduct as to the impairment of execution of the

12

employment contract between Guinn and AAR did not fulfill the prerequisites needed for tortious interference with an employment relationship. No genuine issues of material fact exist as to whether ACE's efforts to use its agreement as a means to induce AAR to terminate Guinn amounted to tortious interference with Guinn's employment contract with AAR.

Id. at 17. The court granted ACE's motion for summary judgment as to Guinn's claim for tortious interference and dismissed Count III of his counterclaim. Guinn now appeals the summary judgment.

## ISSUE AND ARGUMENTS OF THE PARTIES

The issue is whether the trial court erred in granting summary judgment in favor of ACE and against Guinn. Guinn contends that a genuine issue of material fact remains as to whether ACE was justified in its interference with his employment contract with AAR resulting in the termination of his employment with AAR. He argues that ACE contacted AAR multiple times seeking to prevent his employment with AAR, that ACE had no protectable interest in preventing his employment with AAR, and that ACE's interference with his employment with AAR was intentional and malicious. Guinn further contends that ACE knew or should have known that the Agreement was overly broad and unenforceable as all employees were required to enter non-compete agreements, that the terms prevented any employee of ACE from accepting any kind of job from a competitor of ACE, and that from these facts a jury can draw reasonable inferences which support a finding that ACE was not justified in its interference in Guinn's employment contract with AAR.

Guinn specifically notes that the determination of the absence of justification is a question of fact, that under Indiana law the overriding question regarding justification is

13

whether the defendant's conduct has been fair and reasonable under the circumstances, and that this court has stated that this inquiry is highly fact sensitive and best answered by a fact finder. He argues that ACE had a significant business relationship with AAR, that "ACE was a customer and a vendor of AAR and 'in order for the business relationship between ACE and a personal relationship between [the companies] to continue, [AAR] ha[d] to remain neutral,'" and that Sargent had threatened AAR with litigation. Appellant's Brief at 11 (quoting Appellant's Appendix at 167-168). Guinn also asserts that a reasonable trier of fact could infer from the evidence that ACE interfered with Guinn's employment contract with AAR "without a legitimate business purpose." Id. at 12. He further notes that "[a]n employer [] does not have a protectable interest in 'the general knowledge, information or skills gained by the employee in the course of his employment.'" Id. (citation omitted).

ACE contends that Guinn's argument that it should have known that the Agreement was overly broad and unenforceable fails because, at the time ACE informed AAR of the existence of the Agreement, there had been no ruling by the trial court holding the Agreement language unenforceable, there are no designated facts that ACE's efforts to inform AAR of the existence of the Agreement were made in bad faith, and the language of the Agreement was voidable, not void, and thus the court's subsequent ruling that the Agreement was unenforceable did not relate back to the inception of the Agreement. ACE argues that "[t]he main theme of [its] communications [with AAR is] ACE's disappointment that AAR had apparently gone back on its pre-hiring word that it would revoke Guinn's offer of employment due to its conflict with its internal policies"

14

and that there is no evidence that ACE "demanded Guinn be terminated or that it operated with any malevolent intent." Appellee's Brief at 11.

In his reply brief, Guinn claims that ACE had no protectable interest in his FAA trained skills and that ACE's interest was to punish him for leaving its employ and to send a message to other ACE employees who signed the same agreement to "dull any interest in seeking other employment." Appellant's Reply Brief at 7. He also notes that his employment was terminated on September 24, 2010, the same day that Sargent informed Sutterfield that ACE was going to file a lawsuit, and that the designated facts are of such a character that different people may reasonably and fairly draw different conclusions from them and, accordingly, present questions of fact that require a trial.

STANDARD OF REVIEW

Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); Mangold ex rel. Mangold v. Ind. Dep't of Natural Res., 756 N.E.2d 970, 973 (Ind. 2001). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmovant. Mangold, 756 N.E.2d at 973. Our review of a summary judgment motion is limited to those materials designated to the trial court. Id. In reviewing a trial court's ruling on a motion for summary judgment, we may affirm on any grounds supported by the Indiana Trial Rule 56 materials. Catt v. Bd. of Commr's of Knox Cnty., 779 N.E.2d 1, 3 (Ind. 2002). The entry of specific findings and conclusions does not alter the nature of a summary judgment which is a judgment entered when there are no genuine issues of material fact to be resolved. Rice v. Strunk, 670 N.E.2d 1280,

15

1283 (Ind. 1996). In the summary judgment context, we are not bound by the trial court's specific findings of fact and conclusions of law. Id. They merely aid our review by providing us with a statement of reasons for the trial court's actions. Id.

In addition, "[s]ummary judgment is inappropriate where the undisputed facts themselves give rise to conflicting inferences which would alter the outcome." Bochnowski v. Peoples Fed. Sav. & Loan Ass'n, 571 N.E.2d 282, 285 (Ind. 1991); see also Rogier v. Am. Testing and Eng'g Corp., 734 N.E.2d 606, 619 (Ind. Ct. App. 2000) (stating that "even where the facts are undisputed, the ability to reasonably draw from them conflicting inferences which would alter the outcome will make summary judgment inappropriate"), reh'g denied, trans. denied. "Summary judgment should not be granted when it is necessary to weigh the evidence." Bochnowski, 571 N.E.2d at 285. "The evidence before the court must be liberally construed in the light most favorable to the non-moving party." Butler v. City of Indianapolis, 668 N.E.2d 1227, 1228 (Ind. 1996) (citations omitted). "We carefully scrutinize a trial court's grant of summary judgment to assure that the losing party is not improperly prevented from having its day in court." Id.

DISCUSSION

"Indiana has long recognized that intentional interference with a contract is an actionable tort, and includes any intentional, unjustified interference by third parties with [a] . . . contract." Winkler v. V.G. Reed & Sons, Inc, 638 N.E.2d 1228, 1234 (Ind. 1994) (citing Bochnowski, 571 N.E.2d at 284). "The tort reflects the public policy that contract rights are property, and under proper circumstances, are entitled to enforcement and protection from those who tortiously interfere with those rights." Id. (citation omitted).

16

"A plaintiff alleging tortious interference with a contractual relationship must establish five elements: (1) the existence of a valid and enforceable contract; (2) the defendant's knowledge of the existence of the contract; (3) the defendant's intentional inducement of the breach of the contract; (4) the absence of justification; and (5) damages resulting from the defendant's wrongful inducement of the breach." Allison v. Union Hosp., Inc., 883 N.E.2d 113, 118 (Ind. Ct. App. 2008) (citing Winkler, 638 N.E.2d at 1235).

A claim for tortious interference with an employment relationship can be maintained upon a terminable at will agreement. Bradley v. Hall, 720 N.E.2d 747, 751 (Ind. Ct. App. 1999) (citing Bochnowski, 571 N.E.2d at 284-285 (noting that "[t]he parties in an employment at will relationship have no less of an interest in the integrity and security of their contract than do the parties in any other type of contractual relationship" and that "[a]n employee with an at will employment contract must be able to expect that his continued employment depends on the will of his employer and not upon the whim of a third party interferer").

In determining whether a defendant's conduct in intentionally interfering with a contract is justified, the Indiana Supreme Court has examined the following seven factors set forth by the Restatement (Second) of Torts:

(a)     the nature of the defendant's conduct;

(b)     the defendant's motive;

(c)     the interests of the plaintiff with which the defendant's conduct interferes;

(d)     the interests sought to be advanced by the defendant;

17

(e)     the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff;

(f)     the proximity or remoteness of the defendant's conduct to the interference; and

(g)     the relations between the parties.

Allison, 883 N.E.2d at 118 (citing Winkler, 638 N.E.2d at 1235 (citing RESTATEMENT (SECOND) OF TORTS § 767 (1977))). "[T]he weight to be given to each consideration may differ from case to case depending upon the factual circumstances, but *the overriding question is whether the defendants' conduct has been fair and reasonable under the circumstances*." Id. (citing Winkler, 638 N.E.2d at 1235).

Further, with respect to covenants in restraint of trade in employment contracts, this Court has stated that "[a]lthough an employer has a protectible property interest in the good will of his business (including secret or confidential information), the same is not true regarding the general knowledge, information or skills gained by the employee in the course of his employment." Brunner v. Hand Indust., Inc., 603 N.E.2d 157, 160 (Ind. Ct. App. 1992); see also Donahue v. Permacel Tape Corp., 234 Ind. 398, 411, 127 N.E.2d 235, 241 (1955) ("(W)hile an employer, under a proper restrictive agreement, can prevent a former employee from using his trade or business secrets, and other confidential knowledge gained in the course of the employment, and from enticing away old customers, he has no right to unnecessarily interfere with the employee's following any trade or calling for which he is fitted and from which he may earn his livelihood and he cannot preclude him from exercising the skill and general knowledge he has acquired or increased through experience or even instructions while in the employment. Public

18

policy prohibits such undue restrictions upon an employee's liberty of action in his trade or calling.") (quoting Roy v. Bolduc, 140 Me. 103, 34 A.2d 479, 480-481 (1943)); Captain and Co. v. Towne, 404 N.E.2d 1159, 1162 (Ind. Ct. App. 1980) ("[The employer], however, is not entitled to protection from an employee's use of his knowledge, skill or general information acquired or increased through experience or even instructions while in the employment.").

## ANALYSIS

To establish it is entitled to summary judgment, ACE as the movant may meet its burden by demonstrating that the undisputed material facts negate at least one element of Guinn's claim. See Allison, 883 N.E.2d at 119. As noted above and as found by the trial court, Guinn had an at-will employment relationship with AAR beginning when he accepted AAR's August 3, 2010 offer of employment and, as a result, had an interest in the integrity and security of his continued employment which should not "depend[] on . . . the whim of a third party interferer." Bochnowski, 571 N.E.2d at 284-285 ("The parties in an employment at will relationship have no less of an interest in the integrity and security of their contract than do the parties in any other type of contractual relationship"). In addition, ACE had knowledge of Guinn's employment at AAR, ACE's actions of contacting AAR regarding Guinn's employment were intentional, and Guinn suffered damages due to the termination of his employment with AAR. Therefore, we turn to whether the undisputed material facts demonstrate that there was justification for ACE's actions under the circumstances. See Allison, 883 N.E.2d at 118 (noting that one of the five elements of tortious interference is the absence of justification). While, as

19

noted by ACE, the Agreement had not yet been ruled to be unenforceable by the trial court at the time ACE contacted AAR regarding Guinn's employment, that fact alone is not determinative of whether ACE's conduct was justifiable under the circumstances as a matter of law. Instead, we consider the factors set forth by the Restatement (Second) of Torts § 767 to analyze this issue.[11]  See Winkler, 638 N.E.2d at 1235 (discussing RESTATEMENT (SECOND) OF TORTS § 767); Allison, 883 N.E.2d at 119 (applying the factors set forth by § 767 to analyze the issue of whether the undisputed material facts establish that the appellee's actions were justified).

A.    FACTORS UNDER RESTATEMENT (SECOND) OF TORTS § 767

    1.    Nature of ACE's Conduct

With respect to the nature of ACE's conduct, the designated evidence shows that ACE contacted AAR several times regarding Guinn's employment. Before discussing this conduct, we note that Comment c to Restatement (Second) of Torts § 767 states in part:

---

[11] With respect to ACE's assertion that the Agreement was voidable and not void, ACE does not point to relevant authority that a restrictive covenant in an employment agreement which has been determined to be overly broad and thus unenforceable would be voidable at the option of the employee. We acknowledge that the enforceability of the Agreement was not determined until the trial court ruled on Count II of Guinn's counterclaim. The sole fact that a party to a contract may challenge the contract as unenforceable in court does not mean the contract is voidable. See 6 IND. LAW ENCYC. *Contracts* § 1 ("While the expression 'void contract' is in a sense a contradiction in terms, it is used to denote that the parties to the transaction have gone through the form of making a contract, but no binding contract has been formed because of the lack of some essential element of a contract. A void contract is an absolute nullity, incapable of ratification, while a voidable contract is one with respect to which a party has the privilege of electing it to be either valid or void at his pleasure."). The court determined that the Agreement is unenforceable, and Guinn is not required to take further action to avoid being held to its terms and may not take action to ratify its terms. Relevant to the analysis in this case, ACE does not point to authority for the proposition that the characterization of the Agreement as void or voidable impacts the question of whether its conduct was justifiable under the circumstances as described by Indiana case law and the Restatement. That being said, we acknowledge that the fact that the terms of the Agreement, to the extent they were overly broad and not narrowly tailored to protect ACE's legitimate business interests in Guinn's employment, could impact the question of whether ACE's conduct in contacting AAR regarding Guinn's employment was justifiable as a matter of law.

20

There is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract. The interference is often by inducement. The inducement may be any conduct conveying to the third person the actor's desire to influence him not to deal with the other. Thus it may be a simple request or persuasion exerting only moral pressure. Or it may be a statement unaccompanied by any specific request but having the same effect as if the request were specifically made. Or it may be a threat by the actor of physical or economic harm to the third person or to persons in whose welfare he is interested. Or it may be the promise of a benefit to the third person if he will refrain from dealing with the other.

Comment c to § 767 further provides in part:

Under the same circumstances interference by some means is not improper while interference by other means is improper; and, likewise, the same means may be permissible under some circumstances while wrongful in others. The issue is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing it in the manner in which he does cause it. The propriety of the means is not, however, determined as a separate issue unrelated to the other factors. On the contrary, the propriety is determined in the light of all the factors present.

\* \* \* \* \*

*Prosecution of civil suits.* In a very early instance of liability for intentional interference, the means of inducement employed were threats of "mayhem and suits," and both types of threats were deemed tortious. Litigation and the threat of litigation are powerful weapons. When wrongfully instituted, litigation entails harmful consequences to the public interest in judicial administration as well as to the actor's adversaries. The use of these weapons of inducement is ordinarily wrongful if the actor has no belief in the merit of the litigation or if, though having some belief in its merit, he nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication. A typical example of this situation is the case in which the actor threatens the other's prospective customers with suit for the infringement of his patent and either does not believe in the merit of his claim or is determined not to risk an unfavorable judgment and to rely for protection upon the force of his threats and harassment.

\* \* \* \* \*

21

*Economic pressure*. Economic pressure of various types is a common means of inducing persons not to deal with another, as when A refuses to deal with B if B enters into or continues a relation with C, or when A increases his prices to B or induces D not to deal with B on the same condition. Or the pressure may consist of the refusal to admit B to membership into a trade association or a professional organization, as a medical or legal association. The question whether this pressure is proper is answered in the light of the circumstances in which it is exerted, the object sought to be accomplished by the actor, the degree of coercion involved, the extent of the harm that it threatens, the effect upon the neutral parties drawn into the situation, the effects upon competition, and the general reasonableness and appropriateness of this pressure as a means of accomplishing the actor's objective.

See also Winkler, 638 N.E.2d at 1235 (noting that Winkler did not contend that the defendants "applied unfair economic pressure, or threatened litigation which induced Typoservice to breach its contract with him").

Turning to the record in this case, we first note that, as discussed in further detail in part 6 below, ACE and Guinn were not on equal footing in terms of sophistication or the ability to protect their interests. ACE was founded in 1983 and had eighty-five employees in Indianapolis, and, nearly ten months after Guinn began his employment at ACE, he and all employees of ACE were required to sign restrictive covenant agreements. Guinn was told the Agreement was a formality and "didn't necessarily apply to A&P[ mechanics] [a]nd it needed to be on company file." Appellant's Appendix at 164.

The record also shows that, on August 12, 2010, Guinn provided ACE with a two-week notice that he intended to leave his position. Four days after he provided his notice, on August 16, 2010, Drew Cherry with ACE sent a copy of the Agreement by fax to Burdine at AAR. In addition, Sargent, the President of ACE, called Sutterfield with AAR

before Guinn began his new job and told Sutterfield that he believed it was a violation of the Agreement for Guinn to work for AAR. According to a subsequent internal e-mail message at AAR, Sutterfield told ACE at some point and by way of an e-mail message that AAR would not hire Guinn. Guinn commenced his employment with AAR on August 30, 2010.[12] After ACE received a request from FirstLab for background information related to Guinn on September 3, 2010, Cherry with ACE sent a message to FirstLab by fax on September 10, 2010, which stated: "Joe Guinn is under a Non-Compete Agreement, and AAR informed us that their employment offer for Joe Guinn was revoked." Id. at 122. Then, after Guinn began his employment with AAR, Sargent again called Sutterfield and told him that AAR had told him that it would not hire Guinn unless it had a letter from ACE "absolving" him of the Agreement and that AAR "did not do what [it] said [it was] going to do." November 15, 2010 Transcript at 59. On September 14, 2010, an AAR human resources administrator sent an e-mail message to Surges with AAR which stated in part that "[a]ccording to [Sutterfield], the offer of employment was supposed to be rescinded and [Sutterfield] is now being contacted by ACE (Joe's former employer and one of our customers) and *they are very upset because we went back on our word*." Appellant's Appendix at 150 (emphasis added).

The designated evidence then shows that three days later, on September 17, 2010, Sutterfield sent an e-mail message to Sargent attempting to arrange a meeting time, suggesting that the two had previously discussed a meeting. In his reply e-mail message, Sargent said: "I am in Florida Tuesday. Since we spoke some other events have ce [sic]

_____

[12] The record reveals, as noted in more detail in the facts section above, that there was an internal miscommunication at AAR regarding hiring Guinn.

23

to light, I suggest you call on my cell . . . ." Id. at 144. The parties do not indicate whether Sutterfield returned Sargent's message. Four days later, on September 21, 2010, Sutterfield sent an e-mail message to Sargent stating that he had met with other AAR personnel, that Guinn's employment would be terminated, and that AAR's director would contact Sargent after that occurred.

Nevertheless, on September 24, 2010, three days after Sutterfield's e-mail message, Sargent sent an e-mail message to Sutterfield at 10:06 a.m. stating: "[Sutterfield], Have not heard from your director *so I have directed council* [sic] *to file*." Id. at 148 (emphasis added). At 11:14 a.m. that day, Sutterfield forwarded Sargent's e-mail message to Surges, and at 11:33 a.m. Surges sent an e-mail message to Sargent which stated that she would meet with Guinn later in the day to inform him that his employment was terminated and also stated: "*My hope is that this course of action is agreeable to you.* Now that I have your contact information, I will be happy to send you an email when we have completed that meeting so you have documentation it is complete." Id. (emphasis added). Later that day, AAR terminated Guinn's employment. Sutterfield later stated during his deposition that he thought AAR's actions were "what we believed to be in the *best interest of ACE* at the time," that AAR was "*complying with our vendor's request*," that "in order for the business relationship between ACE and a personal relationship between us *to continue, we have to remain neutral*," and that "[t]*his is about business*." Id. at 167-168 (emphases added).

Although the Agreement had not yet been deemed unenforceable by the court at the time ACE contacted AAR, which may tend to favor a determination that ACE's

24

actions were justified, we note that other facts designated by Guinn tend to favor a determination that ACE's conduct was unjustified under the circumstances. The factfinder may consider, in assessing whether ACE's conduct was justified and reasonable, the facts that ACE was a sophisticated employer and prepared the terms of the non-compete agreements which it had all of its employees sign, and the extent to which the terms, conditions, and covenants were unreasonable, overly broad, or not narrowly tailored to protect ACE's legitimate business interests.[13] See Cent. Ind. Podiatry, P.C. v. Krueger, 882 N.E.2d 723, 729 (Ind. 2008) ("In arguing the reasonableness of a non-competition agreement, the employer must first show that it has a legitimate interest to be protected by the agreement.").

While a factfinder could find that ACE's conduct does not support a finding that ACE's interference was unjustified, another possible inference from the facts is that ACE applied unfair economic pressure or threatened litigation which induced AAR to terminate Guinn's employment. See Winkler, 638 N.E.2d at 1235 (noting that Winkler did not contend that the defendants "*applied unfair economic pressure*, or *threatened litigation* which induced Typoservice to breach its contract with him") (emphases added); Comment c. to § 767 (noting, with respect to the prosecution of civil suits, that it is "ordinarily wrongful if the actor . . . , though having some belief in its merit, he nevertheless institutes or threatens to institute the litigation in bad faith, intending only to

---

[13] Even where a legitimate interest is served by a non-competition agreement, to be enforceable, the agreement "must also be reasonable in terms of the time, activities, and geographic area restricted," and a restrictive covenant in an employment contract is to be strictly construed against the employer. Central Ind. Podiatry, P.C. v. Krueger, 882 N.E.2d 723, 729 (Ind. 2008). When facing challenges to non-competition provisions in employment agreements, courts may find an agreement unreasonable in total or apply the well-established "blue-pencil" doctrine by which the court is permitted to remove unreasonable restrictions, provided they are divisible. See Dicen v. New Sesco, Inc., 839 N.E.2d 684, 687 (Ind. 2005).

harass the third parties and not to bring his claim to definitive adjudication," and that with respect to economic pressure, the question whether this pressure is proper "is answered in the light of the circumstances in which it is exerted, *the object sought to be accomplished* by the actor, *the degree of coercion involved*, *the extent of the harm that it threatens*, . . . and *the general reasonableness and appropriateness of this pressure as a means of accomplishing the actor's objective*") (emphases added). A finder of fact can examine and weigh ACE's conduct in light of the specific circumstances of this case, including the object sought by its actions, the degree of coercion involved, the extent of harm threatened, and the reasonableness of its actions given its interests and the interests of AAR and Guinn. We reiterate that "[s]ummary judgment should not be granted when it is necessary to weigh the evidence," see Bochnowski, 571 N.E.2d at 285, and that "[t]he evidence before the court must be liberally construed in the light most favorable to the non-moving party." Butler, 668 N.E.2d at 1228.

Consistent with the Court's observation in Winkler and the statements in the comments to Restatement (Second) of Torts § 767, the designated evidence could weigh in favor of the determination that ACE's interference with Guinn's new employment with AAR was unjustified.

2.    ACE's Motive and Interests Sought to be Advanced

With respect to ACE's motive and interests it sought to advance,[14] ACE essentially asserts that its actions were based on its rights under the Agreement which had

_____

[14] Like in Allison, we consider these two factors together. See Allison, 883 N.E.2d at 120-121. Comment d. to Restatement (Second) of Torts § 767 states in part:

Motive as a factor is often closely interwoven with the other factors listed in this Section,

26

not been determined to be unenforceable at the time of its actions. However, Guinn worked for ACE as an A&P technician in the company's "composite repair station/site, performing composite repair work with Kevlar, fiberglass and carbon fiber—a fabric resin system in accordance with FAA specifications." Appellant's Appendix at 33. When asked at the November 15, 2010 hearing "[w]hat information, if any, did Mr. Guinn have . . . has today that is confidential and not readily available in the marketplace by legal means," Sargent responded that "[o]ne would be certain techniques within a repair composite." November 15, 2010 Transcript at 115. When asked "I don't understand. [Guinn is] an FAA airline mechanic, and that's the work he does, but you claim to have some kind of unique proprietary interest in this man's personal skills that would prevent him from working in the industry that does repair work for airlines," Sargent stated "No," and when asked "[b]e as specific about what you claim your proprietary interest is," Sargent stated "investment and costs in the training." Id.

"Although an employer has a protectible property interest in the goodwill of his business (including secret or confidential information), the same is not true regarding the general knowledge, information or skills gained by the employee in the course of his employment." Brunner, 603 N.E.2d at 160. In Coates v. Heat Wagons, Inc., this court stated that "[a] legitimate protectable interest is an advantage possessed by an employer, the use of which by the employee after the end of the employment relationship would make it unfair to allow the employee to compete with the former employer." 942 N.E.2d

so that they cannot be easily separated. There is obviously a very intimate relation between the factors of motive and of the interests that the actor is trying to promote by his conduct. So close is the relationship that the two factors might well be merged into a single one.

27

905, 913 (Ind. Ct. App. 2011) (citation and internal quotation marks omitted). At a minimum, there is a question of fact as to whether ACE's "investment and costs in the training" of Guinn constituted a protectible interest or general knowledge, information, or skills obtained by Guinn during his employment.

The factfinder may consider the extent to which the terms, conditions, and covenants contained in the Agreement were unreasonable, overly broad, or not narrowly tailored to protect ACE's legitimate business interests and the extent to which this factor may weigh in favor of a finding that ACE's conduct was justified or unjustified under the specific circumstances in this case.

Moreover, all of the employees of ACE were required to sign agreements which contained the restriction on competition, and according to Guinn's deposition testimony, he entered into the Agreement dated January 22, 2009, almost ten months after he began to work for ACE on March 27, 2008, and Guinn was told by ACE's vice president of operations that the Agreement was a formality and didn't necessarily apply to A&P mechanics but it needed to be on file. The trial court noted, in its January 11, 2012 order granting Guinn's motion for partial summary judgment on Count II of his counterclaim, that the non-competition provision of the Agreement was overbroad and that it "did not specify what type of work Guinn did for ACE or what Guinn was prohibited from doing with anyone else" and that "the Agreement appears to have been drafted in such a manner as to apply to *any employee* in *any capacity*." Appellant's Appendix at 68. Comment d. to Restatement (Second) of Torts § 767 states in part that "[i]n determining whether the interference is improper, it may become very important to ascertain whether the actor was

28

motivated, in whole or in part, by a desire to interfere with the other's contractual relations," that "[i]f this was the sole motive the interference is almost certain to be held improper," that "[a] motive to injure another or to vent one's ill will on him serves no socially useful purpose," that "[t]he desire to interfere with the other's contractual relations need not, however, be the sole motive," and that "[i]f it is the primary motive it may carry substantial weight in the balancing process and even if it is only a casual motive it may still be significant in some circumstances."

Based upon the record, a trier of fact could determine that ACE's actions were taken to advance its protectible interests or, on the other hand, that its actions were not intended to protect any legitimate business interests in Guinn's "FAA trained skills" and that its motivation was to punish and send a message to other ACE employees.

3.    Guinn's Interests

With respect to Guinn's interests, he was seeking to protect his continued employment at AAR, his financial interests, and his livelihood. He accepted the job at AAR at a lower hourly wage than he earned at ACE because he could work second shift, allowing him to be home with his children during the day while his wife worked. Guinn alleged that he is a graduate from the Aviation Institute of Maintenance where he completed training as an A&P airline mechanic in January 2008 and that he paid approximately $30,000 to obtain his training. The designated evidence shows that Guinn accepted AAR's August 3, 2010 offer of employment, that his first day of work was on August 30, 2010, and that he was employed with AAR until September 24, 2010. See

29

Allison, 883 N.E.2d at 121 (noting that the appellants were seeking to protect their contractual rights, their financial interests, and their livelihood).

    4.    The Balance Between ACE's Freedom to Act and Guinn's Interests

With respect to the balance between ACE's freedom to act and Guinn's interests, we observe that Indiana courts have long stated that covenants which restrict a person's employment opportunities are strongly disfavored.  See Krueger, 882 N.E.2d at 728-729 ("This Court has long held that noncompetition covenants in employment contracts are in restraint of trade and disfavored by the law.") (citing Dicen v. New Sesco, Inc., 839 N.E.2d 684, 687 (Ind. 2005); Harvest Ins. Agency, Inc. v. Inter-Ocean Ins. Co., 492 N.E.2d 686, 688 (Ind. 1986); Licocci v. Cardinal Assocs., Inc., 445 N.E.2d 556, 561 (Ind. 1983); Donahue, 234 Ind. 398, 127 N.E.2d 235 (noting that an employer "has no right to unnecessarily interfere with the employee's following any trade or calling for which he is fitted and from which he may earn his livelihood and he cannot preclude him from exercising the skill and general knowledge he has acquired or increased through experience or even instructions while in the employment" and that "[p]ublic policy prohibits such undue restrictions upon an employee's liberty of action in his trade or calling") (citation omitted); RESTATEMENT (SECOND) OF CONTRACTS, § 188 cmt. g (1981) ("Post-employment restraints are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through loss of his livelihood.")); Coates, 942 N.E.2d at 913 (finding that "Indiana courts strongly disfavor as restraints of trade covenants not to compete in employment contracts" and that "[a] legitimate

30

protectable interest is an advantage possessed by an employer, the use of which by the employee after the end of the employment relationship would make it unfair to allow the employee to compete with the former employer") (citations and internal quotation marks omitted); Wagler Excavating Corp. v. McKibben Const., Inc., 679 N.E.2d 155, 157-158 (Ind. Ct. App. 1997) (stating that "Indiana courts will not hesitate to strike down any such restrictive covenants which are the least bit overly broad with respect to the 'protectible interest' at stake," and that "[w]here the underlying protectible interest is minimal, courts will closely scrutinize the terms of the restraint"), trans. denied.

5. The Proximity of ACE's Conduct to the Interference

With respect to the relative proximity or remoteness of ACE's conduct to the interference, the record shows that representatives of ACE, including its President, Leigh Sargent, contacted AAR employees various times in August and September, 2010, and Sargent finally indicated that he had directed his counsel to file suit because he had not heard from AAR's director regarding the termination of Guinn's employment. Guinn's employment was terminated on September 24, 2010.

6. The Relations Between the Parties

With respect to the relations between ACE and Guinn and ACE and AAR, as noted above, the record shows that Guinn applied for and accepted a job with AAR because, unlike ACE, AAR operated a second shift. ACE was Guinn's former employer and a vendor or customer of AAR.

31

B.    PROPRIETY OF SUMMARY JUDGMENT

In weighing the factors above, we observe that the ultimate question relating to the justification of the defendant's conduct is whether that conduct has been fair and reasonable under the circumstances. See Allison, 883 N.E.2d at 121. Although it is possible under certain circumstances to determine as a matter of law that an employer's actions were justified, in this case we find that the inquiry is highly fact sensitive as expressed above with respect to many of the § 767 factors and thus best answered by a factfinder. See id. ("We find this inquiry to be so highly fact sensitive that we conclude it is best answered by a factfinder.").

Thus, based upon the record, and noting that the burden is on ACE to prove the non-existence of a genuine issue of material fact, and that summary judgment is not appropriate when it is necessary to weigh the evidence, we conclude that the designated evidence presented by the parties demonstrates that a genuine issue of material fact exists with respect to whether or not ACE's conduct in connection with Guinn's employment relationship with AAR was justified or fair and reasonable under the circumstances. Accordingly, we cannot conclude that ACE is entitled to summary judgment as a matter of law on Guinn's claim for tortious interference under Count III of his counterclaim, and we reverse the trial court's summary judgment ruling in favor of ACE on that claim and remand for further proceedings consistent with this opinion.

CONCLUSION

For the foregoing reasons, we reverse the trial court's order granting summary judgment in favor of ACE and against Guinn with respect to Guinn's claim for tortious interference under Count III of his counterclaim.

Reversed and Remanded.

NAJAM, J., and MATHIAS, J., concur.